[This opinion has been published in *Ohio Official Reports* at 72 Ohio St.3d 545.]

THE STATE OF OHIO, APPELLEE, *v*. CARTER, APPELLANT.

[Cite as *State v. Carter*, 1995-Ohio-104.]

*Criminal law—Aggravated murder—Death penalty upheld, when—Trial court has discretion to determine its response to jury's request for further instruction or clarification of previously given instructions—True question does not constitute "hearsay" as defined by Evid.R. 801—Statement of co-conspirator admissible pursuant to Evid.R. 801(D)(2)(e), when—Confession to police by one co-conspirator implicating a second co-conspirator is not made "during the course and in furtherance of the conspiracy" within the scope of Evid.R. 801(D)(2)(e).*

1. Where, during the course of its deliberations, a jury requests further instruction, or clarification of instructions previously given, a trial court has discretion to determine its response to that request. (*Cincinnati v. Epperson* [1969], 20 Ohio St. 2d 59, 49 O.O.2d 342, 253 N.E.2d 785, paragraph three of the syllabus, overruled.)

2. Because a true question or inquiry is by its nature incapable of being proved either true or false and cannot be offered "to prove the truth of the matter asserted," it does not constitute "hearsay" as defined by Evid.R. 801.

3. The statement of a co-conspirator is not admissible pursuant to Evid.R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof.

4. A confession to police by one co-conspirator implicating a second co-conspirator is not made "during the course and in furtherance of the conspiracy" within the scope of Evid.R. 801(D)(2)(e), as such a statement is made at a point in time when the confessor is no longer attempting to conceal the crime and has abandoned the conspiracy.

(No. 94-10—Submitted March 8, 1995—Decided July 26, 1995.)

APPEAL from the Court of Appeals for Hamilton County, No. C-920604.

_____

{¶ 1} In the early morning hours of April 6, 1992, Frances Messinger was murdered while working alone as a clerk at a United Dairy Farmers convenience store ("UDF") in Cincinnati. A grand jury returned an indictment charging appellant, Cedric Carter, in two counts, with aggravated murder in violation of R.C. 2903.01(B) and aggravated robbery in violation of R.C. 2911.01 based on the events surrounding Messinger's death. The indictment included a felony-murder death specification pursuant to R.C. 2929.04(A)(7), charging Carter with causing death while committing or attempting to commit aggravated robbery, and being the principal offender in an aggravated murder, or alternatively with committing a murder with prior calculation and design. Both counts also contained gun specifications. A jury found Carter guilty as charged and recommended that he be sentenced to death. The death sentence was subsequently imposed by the trial court.

{¶ 2} At approximately 2:15 a.m. on April 6, 1992, Carol Blum, a waitress working directly across the street from the UDF, dialed 911 and reported that she had just seen two black males running from the UDF. At trial, Blum testified that immediately prior to calling 911, she saw two men inside the UDF—one man in front of the counter with both arms extended toward the register with hands together pointing to something, and the second man behind the counter near the register. She saw the man behind the counter bend down, and then observed both men run out. The waitress did not see Messinger standing at any time while she was observing the incident. When Messinger's body was discovered shortly thereafter, an unmelted ice-cream cone was found on the floor of the UDF in the area in front of the counter near the exit doors.

{¶ 3} On April 7 one Kenny Hill surrendered himself to authorities in connection with the Messinger murder. Based on information provided by Hill,

police obtained a search warrant for an apartment at which Carter was temporarily residing. Carter was arrested in the early morning hours of April 8, 1992 during the course of the search which followed. During the search the police recovered the murder weapon, a .38 caliber Smith & Wesson five-shot revolver manufactured between 1877 and 1891, the hammer of which must be pulled back manually prior to the firing of each round.

{¶ 4} Following his arrest, Carter was taken to police headquarters to be interviewed. At approximately 3:50 a.m. Carter signed a waiver of rights form, which recited his rights as delineated in *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. During the tape-recorded statement which followed, Carter admitted being present at the UDF during the course of the robbery, but initially identified Hill as the shooter. The police then discontinued taping the interview, and told Carter his statement was inconsistent with statements police had obtained from other witnesses. Upon resumption of the taping, Carter admitted that he was the shooter at the UDF robbery.

{¶ 5} At trial the state and the defense agreed to many of the facts surrounding the robbery. Both parties are in accord that three men were involved: Carter, Hill (who also entered the UDF store), and Virgil Sims (who drove the car used by Carter and Hill before and after the murder). It is undisputed that Carter shot two times and that one bullet lodged in a carton of cigarettes in a cabinet behind the cash register, while the second struck Messinger in her forehead, killing her.

{¶ 6} Carter testified at the trial and admitted involvement in the crime. Carter testified that he entered the UDF first (without a gun) and that Hill followed shortly thereafter, carrying with him the .38 caliber Smith & Wesson revolver. Carter ordered an ice cream cone, and while Messinger was standing at the cash register to accept payment for the cone, Hill passed the gun to Carter. Carter denied, however, that he had intended to kill Messinger. He testified that he had been a heavy user of crack cocaine; that he used significant amounts of alcohol, marijuana

and crack cocaine during the period leading up to the murder; and that Hill was his supplier. Although Carter admitted that he entered the store with the intent to rob it, he testified that he and Hill had not talked about robbing the store until immediately prior to the robbery. He further testified that he never intended to be the one to hold the gun during the robbery. He admitted, however, that he knew the gun had bullets, and that Hill had showed him earlier in the day how to shoot it. He further admitted that before robbing the UDF the three had participated in "a lot" of robberies of drug dealers that same evening, and that only Hill had used the gun to threaten the victims in those robberies while Carter remained in the car. Carter testified that he first fired the gun at the floor to scare Messinger as she pushed the gun away and shut the register drawer. Carter testified he told Messinger to open the cash register, but she refused. He stated that Hill then suggested leaving, and that as they turned to leave, he fired a second shot when Messinger began fumbling in an apparent attempt to push an alarm button. Carter maintained consistently that he did not aim at Messinger, but instead aimed to fire a shot by her to scare her, and never intended to shoot her.

{¶ 7} Medical testimony established that Messinger was killed as a result of a bullet wound which entered her forehead slightly left of the midline. The bullet traveled sharply left to right, and front to rear, with a slight upward angle. No stippling or gunpowder burns were found on Messinger's skin, indicating that the gun had been fired from a distance greater than one foot.

{¶ 8} The court of appeals affirmed Carter's convictions and death sentence, and the cause is now before this court upon an appeal as of right.

—————————

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Christian J. Schaefer*, Assistant Prosecuting Attorney, for appellee.

*David J. Boyd* and *Bruce K. Hust*, for appellant.

—————————

**MOYER, C.J.**

{¶ 9} Appellant has raised twenty-eight propositions of law. We have reviewed each and, for the reasons stated below, find that none justifies reversal of appellant's conviction of the crimes of aggravated murder and aggravated robbery. In addition, we have fulfilled our responsibilities to independently review the record, weigh the aggravating circumstance(s) against the mitigating factors, and examine the proportionality of a sentence of death in this case. Upon full review of the record we affirm appellant's convictions and death sentence.

I

*Hearsay*

{¶ 10} In his first proposition of law, appellant argues that the trial court committed prejudicial error in allowing several witnesses to testify as to statements allegedly made by appellant and his accomplice, Kenny Hill, over the defense's objection on hearsay grounds.

{¶ 11} 1. James A. Landrum Jr. testified that he overheard Hill ask Landrum's father prior to the UDF robbery where he (Hill) could obtain a gun and ammunition.

{¶ 12} 2. Charles Horton, age fifteen, testified that prior to the UDF robbery, he heard Carter and Hill generally discussing plans to "ro[b] a place."

{¶ 13} 3. Police Specialist David Feldhaus testified that, the day after the UDF robbery, Hill told Feldhaus that he (Hill) had the gun with him when he, Sims and Carter had discussed going out and trying to find a person to rob.

{¶ 14} The state's argument in response is twofold. The state argues (1) that this testimony did not constitute hearsay, and (2) that the statements were admissible pursuant to Evid.R. 801(D)(2)(e), which provides that statements "by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy" do not fall within the definition of "hearsay."

**{¶ 15}** We consider separately the admissibility of each of the statements at issue.

A

*Landrum's Testimony*

**{¶ 16}** Evid.R. 801(C) defines "hearsay" as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence *to prove the truth of the matter asserted*." (Emphasis added.) A witness is barred on hearsay grounds from testifying as to the statements made by another only when the statement is offered to prove the truth of the matter asserted in the statement, and only where the statement falls outside any exceptions to the rule against hearsay[1] as set forth in, *e.g*., Evid.R. 803 and 804. See *State v. Davis*, (1991), 62 Ohio St.3d 326, 344, 581 N.E.2d 1362, 1378 (admissibility of a written investigative report of the Drug Enforcement Administration not inadmissible hearsay because not offered to prove the truth of the matters contained therein, but as relevant to the knowledge and state of mind of the person in possession of the report).

**{¶ 17}** Landrum testified that he overheard Hill question Landrum's father as to where a gun and ammunition could be obtained. Hill's questions do not fall within the definition of "hearsay" because they did not constitute "assertions." An "assertion" for hearsay purposes "simply means *to say that something is so, e.g., that an event happened or that a condition existed*." (Emphasis *sic*.) 2 McCormick on Evidence (4 Ed. 1992) 98, Section 246. We hold that because a true question or inquiry is by its nature incapable of being proved either true or false and cannot be offered "to prove the truth of the matter asserted," it does not constitute hearsay as

---

1. Evid R. 802 contains the general prohibition against the admission of hearsay. It provides:

    "Hearsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio."

defined by Evid.R. 801. Accord *United States v. Vest* (C.A. 1, 1988), 842 F.2d 1319; *United States v. Lewis* (C.A. 5, 1990), 902 F.2d 1176; *Washington v. State* (1991), 589 A.2d 493, 87 Md. App. 132; *Bustamante v. State* (Ind. 1989), 537 N.E.2d 1188. Hill's questions fall into this nonassertive category, and Landrum could properly testify as to the fact that Hill asked them. The trial court properly allowed this testimony by James Landrum, Jr.

B

*Horton's Testimony*

{¶ 18} The state elicited testimony from Charles Horton that he overheard Carter and Hill discussing a plan to commit a robbery prior to April 6. The state contended at trial that this testimony was admissible pursuant to Evid.R. 801(D)(2)(e), which, in defining "hearsay," excludes statements "offered against a party *** by a co-conspirator of a party during the course and in furtherance of the conspiracy *upon independent proof of the conspiracy*." (Emphasis added.) Thus, pursuant to the express terms of the rule, the statement of a co-conspirator is not admissible pursuant to Evid.R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof. Inclusion of the phrase "upon independent proof of the conspiracy" in Evid.R. 801(D)(2)(e) distinguishes Ohio practice from practice under the Federal Rules of Evidence, and precludes a finding that the statement itself may be used to establish the existence of the conspiracy. See Giannelli, Ohio Rules of Evidence Handbook (5 Ed. 1994) 211, 214. The record in the case at bar reflects that at the time Horton testified, the state had barely established that any relationship whatsoever existed between Carter and Hill, let alone that they were co-conspirators in a scheme to commit robberies. Thus, at the time Horton's testimony was elicited, the requisite foundational prima facie showing of the existence of a conspiracy between Carter and Hill by independent proof had not been made by the state as required by Evid.R. 801(D)(2)(e), even though "independent proof of the

conspiracy" was subsequently provided by the state through introduction into evidence of the defendant's tape-recorded statement to police. Cf. *State v. Milo* (1982), 6 Ohio App.3d 19, 22?23, 6 OBR 44, 47, 451 N.E.2d 1253, 1257; *State v. Jurek* (1989), 52 Ohio App.3d 30, 35-36, 556 N.E.2d 1191, 1197. Any error in allowing Horton's testimony pursuant to the co-conspirator rule is, however, harmless on this record. At trial the state introduced evidence of Carter's taped confession and appellant fully admitted his involvement in the commission of the UDF robbery and other robberies on the night of the murder. Cf: *Milo, supra*. Error in admitting hearsay does not justify reversal where it is harmless. See *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343.

C

*Police Specialist Feldhaus' Testimony*

{¶ 19} Statements made by a co-conspirator after the conspiracy has been abandoned do not fall within the scope of Evid.R. 801(D)(2(e), and may not be deemed admissible pursuant to that rule. *State v. Duerr* (1982), 8 Ohio App.3d 396, 8 OBR 511, 457 N.E.2d 834, certiorari denied (1983), 464 U.S. 816, 104 S.Ct. 74, 78 L.Ed.2d 86. A confession to police by one co-conspirator implicating a second co-conspirator is not made "during the course and in furtherance of the conspiracy" within the scope of Evid.R. 801(D)(2)(e), as such a statement is made at a point in time when the confessor is no longer attempting to conceal the crime and has abandoned the conspiracy. In the instant case Hill turned himself in and confessed his involvement in the crime the day after Messinger was murdered. Since at that point Hill clearly had given up any attempt to "furthe[r] *** the conspiracy" between himself, the appellant and Sims, his statements to Feldhaus did not fall within the scope of Evid.R. 801(D)(2)(e) and that rule did not justify the admission of Hill's hearsay statements. Again, however, any error committed thereby is harmless, as Hill's account of the facts of the robbery as testified to by Feldhaus is

in accord with those subsequently made by the appellant himself during his confession and at trial. *Sage, supra*.

## II

### *Miranda Issues*

{¶ 20} Carter claims that the trial court erred in allowing his confession into evidence in that the state provided insufficient evidence at a pretrial suppression hearing that Carter knowingly, intelligently and voluntarily waived his Fifth Amendment rights.

{¶ 21} At the suppression hearing held in this case the defendant testified that he was half-asleep and under the influence of crack cocaine and alcohol when he signed the *Miranda* waiver and gave his confession after being taken into custody in the middle of the night. Carter also testified that the police induced him to make a statement by threatening that if he didn't tell them the truth that they (the police) would kill him. Appellant argues that this testimony should be accepted and interpreted as a promise to Carter that if he cooperated, he would not be faced with the death penalty. Appellant claims that his age (nineteen) and lack of formal, consistent education beyond the eighth grade reinforce his claim that his waiver was not knowing.

{¶ 22} The state relies on the testimony of the interviewing officers that full warnings were given, and on the defendant's confirmation on the audio tape that he understood his rights and had signed the waiver form while the tape recorder was turned off. The officers testified that Carter was read his rights no less than three times, including immediately upon his being taken into custody; that he appeared coherent and not intoxicated; and that an officer read each line of the waiver form aloud, and asked Carter after reading each line to confirm that he understood. The officers denied making any threats.

{¶ 23} At a suppression hearing, the evaluation of evidence and credibility of witnesses are issues for the trier of fact. *State v. Mills* (1992), 62 Ohio St.3d 357,

366, 582 N.E.2d 972, 982.  Carter's *Miranda* arguments are unconvincing.  It is clear that the court believed the officers' version of how Carter's statement was obtained, and rejected the defendant's version. Our evaluation of the audiotape of Carter's statement reinforces the conclusion that Carter was neither intoxicated nor otherwise incompetent. A reversal of the trial court's finding of a knowing, intelligent and voluntary waiver is not justified on this record.

{¶ 24} We similarly reject Carter's contention that "it should be required that an individual be permitted to talk to an attorney even though he supposedly states that he does not want one." To so hold would be "to imprison a man in his privileges and call it the Constitution." *Adams v. United States ex rel. McCann* (1942), 317 U.S. 269, 280, 87 L.Ed. 268, 275, 63 S. Ct. 236, 242.  In a recent case, the United States Supreme Court noted that "[n]othing in *Edwards* [*v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378] requires the provision of counsel to a suspect who consents to answer questions without the assistance of a lawyer."  *Davis v. United States* (1994), 512 U.S., 114 S.Ct. 2350, 2356, 129 L.Ed.2d 362, 372, citing *Miranda's* rejection of the proposition that "'each police station must have a "station house lawyer" present at all times to advise prisoners.'" See, also, *Michigan v. Mosley* (1975), 423 U.S. 96, 108-109, 96 S.Ct. 321, 328-329, 46 L.Ed.2d 313, 324-325 (White, J., concurring).

### III

### *Jury Question*

**{¶ 25}** The trial court provided the jury with a written copy of its instructions, which included a definition of "purpose" based on R.C. 2901.22(A).[2] The jury sent the following note to the court while deliberating in the guilt phase:

"We would like a further explanation of a particular sentence in the fifth paragraph under Count I [of the jury instructions]. The sentence: A person acts purposely when the gist of the offense is a prohibition against the [sic] conduct of a certain nature, regardless of what the offender attempts to accomplish thereby, if it is his specific intention to engage in conduct of that nature."

**{¶ 26}** The judge responded by refusing to instruct further, and by telling the jury that it had all the instructions it needed. Carter contends that the trial court had an affirmative duty to issue a supplemental instruction upon receipt of this note pursuant to *Cincinnati v. Epperson* (1969), 20 Ohio St. 2d 59, 49 O.O. 2d 342, 253 N.E.2d 785. Paragraph three of the syllabus in *Epperson* provides that "[t]he failure by the trial court in a criminal case to answer a question of law relating to a defense presented, which is submitted to the court by the jury after they had retired to deliberate, is error prejudicial to defendant's substantial rights."

**{¶ 27}** Both the First and Sixth Ohio Appellate Districts have held that *Epperson* no longer constitutes binding precedent in that former R.C. 2315.06 (upon which *Epperson* was based) was later repealed by the General Assembly effective in 1971. 133 Ohio Laws, Book III, 3019-3020. *State v. Gleason* (1989), 65 Ohio App.3d 206, 583 N.E.2d 975; *State v. Robinson* (June 13, 1986), Lucas App. No. L-85-278, unreported, 1986, WL, 6699. These courts substituted an

---

2. R.C. 2901.22(A) provides: "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."

abuse-of-discretion standard to be used when a jury asks a question of law of the court during deliberations. We agree. We today expressly overrule the third paragraph of the syllabus of *Cincinnati v. Epperson*, *supra*, and hold that where, during the course of its deliberations, a jury requests further instruction, or clarification of instructions previously given, a trial court has discretion to determine its response to that request. A reversal of a conviction based upon a trial court's response to such a request requires a showing that the trial court abused its discretion. In the case at bar, defense counsel raised no objection to the trial court's response to the jury question, and the court acted within the scope of its discretion in view of the nature of the instructions previously given.

IV

*Sufficiency of Evidence*

{¶ 28} The crime of aggravated felony murder requires proof that the accused "purposely cause[d] the death of another." R.C. 2903.01(B). In addition, the defendant must be "specifically found to have intended to cause the death of another." R.C. 2903.01(D).

{¶ 29} Carter essentially argues that the state's evidence was insufficient to satisfy these two statutory elements of the crime of aggravated murder and that the trial court erred in denying his Crim.R. 29 motion for acquittal. We disagree. In analyzing issues of sufficiency of evidence, a reviewing court must view the evidence "in the light most favorable to the prosecution," and ask whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct 2781, 2789, 61 L.Ed.2d 560, 573; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶ 30} In this case, the defendant testified that he shot "to scare" Messinger, that he was unfamiliar with guns, and that he never intended to shoot Messinger. The jury was under no obligation to accept this testimony as truthful. See, *e.g., State*

*v. Jackson* (1991), 57 Ohio St.3d 29, 34, 565 N.E.2d 549, 555. The jury could quite easily and reasonably have found purpose to kill beyond a reasonable doubt despite this testimony. A person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts, *State v. Seiber* (1990), 56 Ohio St.3d 4, 13, 564 N.E.2d 408, 419; *State v. Thomas* (1988), 40 Ohio St. 3d 213, 217, 533 N.E.2d 286, 290, and intent can be determined from the surrounding facts and circumstances, see *State v. Johnson* (1978), 56 Ohio St. 2d 35, 38, 10 O.O. 3d 78, 80, 381 N.E.2d 637, 640; *State v. Robinson* (1954), 161 Ohio St. 213, 53 O.O. 96, 118 N.E.2d 517, paragraph five of the syllabus. Based on the eyewitness testimony of Carol Blum, the jury could have concluded that Messinger was shot before the robbers turned to flee, at a point in time when the gun held by Carter was in close proximity to the victim. The jury had before it additional evidence that Messinger was killed by a bullet which entered the middle of her forehead. It was undisputed that the gun used in the robbery required the shooter to separately cock the hammer each time before refiring, justifying the conclusion that Carter intentionally prepared his gun to fire a second shot after first firing into the cigarette cabinet behind the cash register. Sufficient evidence existed to support the finding that Carter possessed purpose to cause Messinger's death as contemplated by R.C. 2903.01(B) and (D). The offense of aggravated robbery, when committed with a loaded gun, is "likely to produce death." *State v. Widner* (1982), 69 Ohio St. 2d 267, 270, 23 O.O. 3d 265, 266, 431 N.E.2d 1025, 1028; *State v. Clark* (1978), 55 Ohio St. 2d 257, 9 O.O. 3d 257, 379 N.E.2d 597.

{¶ 31} Carter's contentions that his convictions were not based on sufficient evidence and that a motion to acquit should have been granted at the close of the state's case have no merit.

## V

### *Voir Dire*

**{¶ 32}** Carter has raised several issues challenging the trial court's procedures in conducting voir dire.

## A

### *Jury Sequestration*

**{¶ 33}** Carter asserts that the trial court erred in denying his motion to examine prospective jurors separately and out of the hearing of other prospective jurors. Carter's argument is foreclosed by our holding in *State v. Mapes* (1985), 19 Ohio St.3d 108, 19 OBR 318, 484 N.E.2d 140, that "[t]he determination of whether a voir dire in a capital case should be conducted in sequestration is a matter of discretion within the province of the trial judge." Id. at paragraph three of the syllabus. See, also, *State v. Brown* (1988), 38 Ohio St. 3d 305, 528 N.E.2d 523, paragraph two of the syllabus. Carter has neither recited facts showing abuse of discretion nor demonstrated prejudice resulting from the court's refusal to conduct a sequestered voir dire.

**{¶ 34}** Carter argues that the trial court abused its discretion in that the "sheer repetition" of the same questions being asked of others on the panel, in combination with the effect of being influenced by the opinions expressed by prior veniremen, is enough to prejudice the group. This argument assumes that group voir dire is inherently prejudicial, and as such challenges the validity of the court's prior holdings in *Mapes* and *Brown*. We decline to modify those holdings.

## B

### *Defense-proffered Jury Questionnaire*

**{¶ 35}** Carter asserts error in the trial court's refusal to submit his proposed questionnaire to the venire prior to voir dire. The argument lacks merit. See *State v. Mills, supra*, 62 Ohio St.3d at 365, 582 N.E.2d at 981; *State v. Loza* (1994), 71 Ohio St. 3d 61, 73, 641 N.E.2d 1082, 1098-1099. In this case defense counsel did

not dispute that the court's standard questionnaire, which was given to the jurors, was similar to the one defense counsel proffered. Further, the trial court specifically informed counsel that he was free to ask additional questions during the voir dire itself. The defendant was accorded his right to meaningfully examine prospective jurors.

## C

### *Refusal to Allow Twelve Peremptory Challenges*

{¶ 36} Crim. R. 24(C) provides each party with six peremptory challenges. Carter argues that allowance of more than six peremptory challenges is constitutionally required in order to assure a qualified and unbiased jury. Although we acknowledge the importance of the availability of peremptory challenges to both prosecutors and defendants, neither the United States Constitution nor the Ohio Constitution accords a party a right to any particular number of peremptory challenges. *United States v. Turner* (C.A. 9, 1977), 558 F.2d 535, 538. See, also, *Swain v. Alabama* (1965), 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759. In addition, this court has previously rejected similar arguments that a capital defendant is entitled to more than six peremptory challenges. See *State v. Mills, supra*, 62 Ohio St.3d at 365, 582 N.E.2d at 981; *State v. Greer* (1988), 39 Ohio St.3d 236, 244?246, 530 N.E.2d 382, 394?396. We today adhere to that precedent.

## VI

### *Venue*

{¶ 37} Carter argues that the trial court erred in refusing to change the venue of his trial, in that pretrial publicity in Hamilton County precluded a fair trial in that county. In reviewing this contention we are guided by established principles that "'[a]ny decision on changing venue rests largely in the discretion of the trial court. Absent a clear showing of an abuse of discretion, the trial court's decision controls.' [Citations omitted.] Moreover, the interests of judicial economy, convenience, and reduction of public expenses necessitate that judges make a good faith effort to seat

a jury before granting a change in venue. [Citations omitted.] 'It has long been the rule in Ohio that "the examination of jurors on their voir dire affords the best test as to whether prejudice exists in the community ***"' [Citations omitted.]." *State v. Fox* (1994), 69 Ohio St.3d 183, 189, 631 N.E.2d 124, 129-130.

{¶ 38} Carter does not allege specific facts tending to show that the trial court abused its discretion in failing to order a change of venue, but argues that the trial court should have ordered a change of venue because there was a reasonable likelihood of prejudicial, pretrial publicity. We disagree. "[W]here the record on voir dire establishes that prospective veniremen have been exposed to pretrial publicity but affirmed they would judge the defendant solely on the law and evidence presented at trial, it is not error to empanel such veniremen." *State v. Maurer* (1984), 15 Ohio St.3d 239, 252, 15 OBR 379, 390, 473 N.E.2d 768, 781. See, also *State v. Spirko* (1991), 59 Ohio St.3d 1, 23, 570 N.E.2d 229, 253?254. The record reflects that jurors seated in this case made such affirmations. Carter has failed to demonstrate that the trial court abused its discretion in refusing to change the venue of his trial.

## VII

### *Alleged Evidentiary Error*

{¶ 39} The trial court allowed Police Specialist Feldhaus to testify on cross-examination that Carter's co-conspirators Sims and Hill were charged with complicity to aggravated murder, a noncapital offense. When defense counsel attempted to elicit testimony from Feldhaus as to why Sims and Hill were charged with lesser crimes than Carter, the state objected, claiming that the question called for a legal conclusion. Feldhaus could not have had personal or firsthand knowledge to answer, even if the information sought were deemed relevant (which we do not here decide) as "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." Evid.R. 602. The grand jury itself rather than the police was responsible

for the indictments of Carter, Hill and Sims, and deliberations of a grand jury are conducted secretly. Crim.R. 6(D) and (E). The trial court did not err in refusing to allow this line of questioning.

## VIII

### *Prosecutorial Misconduct*

{¶ 40} The conduct of a prosecuting attorney during trial does not constitute a ground of error unless the conduct deprives the defendant of a fair trial. *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 24, 514 N.E.2d 394, 400; *State v. Keenan* (1993), 66 Ohio St. 3d 402, 613 N.E.2d 203. A prosecutor is not precluded from referring to the nature and circumstances surrounding a capital offense to explain why the specified aggravating circumstance or circumstances outweigh any mitigating factors. *State v. Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071, 1077; *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus; *State v. Lott* (1990), 51 Ohio St.3d 160, 171, 555 N.E.2d 293, 305. In this case Carter correctly points out that the prosecutor in the heat of argument misstated certain aspects of the law (e.g., "You already know what aggravating circumstances are. *** *They are everything that surrounds the facts of this particular case*." [Emphasis added].) No objection was made to these comments. While defense counsel did object when the prosecutor stated, "There is no dispute as to [Carter's] convictions. *But criminal history deals with a lot of suspicious conduct*" (emphasis added), we note that the trial court adequately instructed the jury as to both the definitions of "aggravating circumstances" and mitigating factors as well as the process by which the jury was to weigh the aggravating circumstance against the mitigating factors. We have reviewed the record and find that, when read as a whole, it supports the conclusion that defendant was fairly tried. The conduct of the prosecutor in this case, although worthy of criticism, does not rise to the level of reversible error.

## IX

*Ineffective Assistance of Counsel*

{¶ 41} The standard by which we review claims of ineffective assistance of counsel is well established. Pursuant to *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693, in order to prevail on such a claim, the appellant must demonstrate both (1) deficient performance, and (2) resulting prejudice, *i.e*., errors on the part of counsel of a nature so serious that there exists a reasonable probability that, in the absence of those errors, the result of the trial would have been different. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373; *State v. Combs*, *supra*. Judicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel. To justify a finding of ineffective assistance of counsel, the appellant must overcome a strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Strickland* at 689, 104 S.Ct. at 2065, 80 L.Ed. 2d at 694-695; *State v. Wickline* (1990), 50 Ohio St.3d 114, 126, 552 N.E.2d 913, 925. Prejudice from defective representation sufficient to justify reversal of a conviction exists only where the result of a trial was unreliable or the proceeding fundamentally unfair because of the performance of trial counsel. *Lockhart v. Fretwell* (1993), 506 U.S. , 113 S. Ct. 838, 842-843, 122 L.Ed.2d 180, 189-191.

{¶ 42} Carter claims that ineffective assistance of his trial counsel is demonstrated by (1) counsel's failure to file a Crim.R. 13 motion to consolidate his trial with that of Hill and Sims, and to subpoena Hill to testify; (2) counsel's failure to obtain a firearms expert to provide testimony reinforcing Carter's contention that he lacked intent to kill; (3) counsel's presentation of a clinical psychologist during the mitigation hearing whose testimony was mixed in nature and included recitation of facts prejudicial to Carter; and (4) counsel's failure to call Carter's mother to testify during the mitigation hearing. None of these alleged deficiencies rises to the

level of prejudicial deficient performance, nor otherwise meets the ineffective assistance of counsel criteria set forth above.

## X

### Alleged Instructional Error

{¶ 43} Carter contends that the trial court erroneously instructed the jury on statutory mitigating factors of R.C. 2929.04(B) not raised by the evidence, and thereby transformed their absence into nonstatutory aggravating circumstances. His argument is not supported by the record. The trial court properly instructed the jury as to the mitigating factors argued by the defense, *i.e.*, Carter acted under duress, coercion or strong provocation (R.C. 2929.04[B][2]); Carter lacked the substantial capacity to appreciate the criminality of his conduct (R.C. 2929.04[B][3]); Carter's youth (age nineteen at time of murder) (R.C. 2929.04[B][4]); Carter's lack of a significant history of prior criminal convictions or delinquency adjudications (R.C. 2929.04[B][5]); and other mitigating evidence, *e.g.*, Carter's personality, childhood history, and cocaine dependence (R.C. 2929.04[B][7]). The trial court included no instructions as to the two remaining statutory factors not raised by Carter, *i.e.*, R.C. 2929.04(B)(1) (victim induced or facilitated offense); or (B)(6) (defendant is an aider or abettor but not a principal offender). The trial court did not otherwise infer that the absence of statutory mitigating factors should be transformed into extra statutory aggravating circumstances.

{¶ 44} Nor is error demonstrated by the fact that the trial court instructed the jury that it was called upon to "recommend" a non-binding sentence of death if it found the aggravating circumstance to outweigh the mitigating factors. The argument that such an instruction impermissibly reduces the jury's sense of responsibility in recommending death has been consistently rejected by this court. See *State v. Bradley, supra*, 42 Ohio Sts.3d at 147, 538 N.E. 2d at 384, citing *State v. Buell* (1986), 22 Ohio St. 3d 124, 22 OBR 203, 489 N.E.2d 795; *State v. Rogers*

(1986), 28 Ohio St. 3d 427, 28 OBR 480, 504 N.E.2d 52; *State v. Steffen* (1987), 31 Ohio St.3d 111, 509 N.E.2d 383. See, also, *State v. Jackson, supra*, 57 Ohio St.3d at 40, 565 N.E.2d at 561; *State v. Grant* (1993), 67 Ohio St. 3d 465, 472, 620 N.E.2d 50, 61. Similarly, no error was committed in providing the jury with a verdict form which included the words "we *** recommend" a sentence of death. We do, however, restate our preference that courts trying capital cases include in jury instructions a statement similar to that commended in *State v. Mills, supra*, 62 Ohio St.3d at 375, 582 N.E.2d at 988, that, "'[s]imply put, you should recommend the appropriate sentence as though your recommendation will, in fact, be carried out.'"

{¶ 45} As a final example of instructional error, Carter claims that the trial court should have instructed the jury as to the minimum length of time defendant would be incarcerated before becoming eligible for parole were he given a life sentence. Trial counsel did not proffer such an instruction, and error, if any, in its omission has been waived. *State v. Jackson, supra*, 57 Ohio St.3d at 41, 565 N.E. 2d at 562 (failure to object to a jury instruction is waived "'unless, but for the error, the outcome of the trial clearly would have been otherwise'"). See, also, Crim. R. 52(B). We do not believe that the jury clearly would have returned a different verdict had this instruction been given, particularly in light of the fact that the jury was otherwise instructed that a life sentence would involve parole eligibility after twenty or thirty *full* years of imprisonment.

XI

*Miscellaneous Penalty Phase Issues*

A

*Separate Juries*

{¶ 46} Contrary to Carter's assertions, separate juries need not be seated for the penalty and guilt phases of a capital trial. Indeed, in Ohio the same jury which found the capital defendant guilty of aggravated murder and the death specification must also return the recommendation of life or death following the mitigation hearing. See *State v. Penix* (1987), 32 Ohio St. 3d 369, 372, 513 N.E.2d 744, 747-748 ("There is no statutory provision for a second jury to be impaneled and make a recommendation on the death penalty at resentencing. *** [T]he sentencing recommendation must be made by the same jury that convicted the offender at the guilt phase of this bifurcated proceeding.").

B

*Failure to Provide Transcript of Psychologist Testimony*

{¶ 47} On the second day of its deliberations concerning the penalty recommendation, the jury requested that it be provided with a transcript of the testimony of the psychologist who testified in Carter's behalf at the mitigation hearing. The trial court refused to provide such a transcript. We are called upon to review this refusal pursuant to an abuse-of-discretion analysis. See *State v. Berry* (1971), 25 Ohio St.2d 255, 54 O.O.2d 374, 267 N.E.2d 775, paragraph four of the syllabus ("After jurors retire to deliberate, upon request from the jury, a court in the exercise of sound discretion may cause to be read all or part of the testimony of any witness ***."). See, also, *State v. Davis, supra*, 62 Ohio St.3d at 340, 581 N.E.2d at 1375. Because defense counsel did not object to the trial court's refusal to provide the transcript, reversal on the basis of this proposition would require a finding of plain error.

**{¶ 48}** We do not find on this record that the trial court abused its discretion in refusing to provide a copy of the transcript, and certainly do not find plain error. Carter argues that the court's refusal prejudiced him in that it was likely that the jury remembered only the vivid and negative aspects of the psychologist's testimony, *e.g.,* that the defendant's history included sadistic behavior, and that the jury asked for the transcript so that it might have an opportunity to review the more technical, and favorable, portions of the psychologist's testimony. This contention is purely speculative, and constitutes much too thin a reed to support reversal of Carter's death sentence.

C

*Alleged Unconstitutionality of Ohio's Death Penalty Statutes*

**{¶ 49}** We reject Carter's argument that Ohio's death penalty statutory framework is unconstitutional. "*** [W]e have consistently held that Ohio's death penalty scheme is constitutional and we continue to adhere to that position." *State v. Woodard* (1993) 68 Ohio St.3d 70, 79, 623 N.E.2d 75, 82. See, also, e.g., *State v. Beuke* (1988), 38 Ohio St.3d 29, 38-39, 526 N.E.2d 274, 285; *State v. Bedford* (1988), 39 Ohio St.3d 122, 132, 529 N.E.2d 913, 923; *State v. Sowell* (1988), 39 Ohio St.3d 322, 336, 530 N.E.2d 1294, 1309; *State v. Bradley, supra*, 42 Ohio St.3d at 148, 538 N.E.2d at 385.

XII

*Independent Review*

**{¶ 50}** The evidence shows beyond a reasonable doubt that the defendant was the principal offender in a felony-murder based on attempted aggravated robbery. R.C. 2929.04(A)(7). Against this sole specification, the appellant asks us to weigh Carter's age (nineteen), the coercive influence of Hill (who was not charged with a death-penalty crime), Carter's relatively clean record (only two misdemeanor convictions), the fact that Carter was of low intellect, and that he had been raised in a less-than-ideal environment. The defense also urges this court to

include in its weighing any residual doubt it may have that Carter possessed the required element of specific intent to kill based on Carter's contention that he never meant to shoot Messinger.

## A

### *Youth of Offender*

{¶ 51} Where a defendant kills at the age of eighteen or nineteen this court has on several occasions held that the element of youth is entitled to little weight. See *State v. Slagle* (1992), 65 Ohio St.3d 597, 613, 605 N.E.2d 916, 931; *State v. Hill* (1992), 64 Ohio St. 3d 313, 335, 595 N.E.2d 884, 901; *State v. Byrd* (1987), 32 Ohio St.3d 79, 93, 512 N.E.2d 611, 625; *State v. Powell* (1990), 49 Ohio St. 3d 255, 264, 552 N.E.2d 191, 201; *State v. Cooey* (1989), 46 Ohio St. 3d 20, 544 N.E.2d 895.

## B

### *Poor Childhood*

{¶ 52} We find that mitigating value does exist based on negative aspects of Carter's childhood, and accord it the little weight to which it is entitled.

## C

### *Influence of Cocaine Intoxication/Loss of Impulse Control*

{¶ 53} In *State v. Benner* (1988), 40 Ohio St.3d 301, 319, 533 N.E.2d 701, 719, a defense expert testified as to the defendant's potential for drug-induced behavior, lack of anger control and mood instability. This court acknowledged that the testimony was worthy of consideration, but "not entitled to much weight." See, also, *State v. Lewis* (1993), 67 Ohio St.3d 200, 209, 616 N.E.2d 921, 928. Similarly, we have considered the evidence of cocaine and other drug intoxication presented by Carter and have accorded it the little value it merits.

D

*Residual Doubt*

**{¶ 54}** The trial court, which observed the witnesses and their credibility, was firmly convinced that Carter possessed the intent required of both the crime of aggravated murder and the death specification. Although we have before us a cold record, the jury's recommendation and trial court's sentence are supported by ample evidence. We have fully considered the degree of residual doubt inherent in this record, and have accorded it the small weight we believe it is due.

E

*"Coercion" from Kenny Hill*

**{¶ 55}** Where proven, the fact that a capital defendant was under "strong *** domination" by another so as to cause him to act other than he ordinarily would is mitigating in nature. See *State v. Woods* (1976), 48 Ohio St.2d 127, 137, 2 O.O.3d 289, 357 N.E.2d 1059, 1066. Low intelligence of the defendant and susceptibility to the influences of others are relevant to a determination of the existence of coercion. See *State v. Powell, supra*, 49 Ohio St.3d at 263, 552 N.E.2d at 200; *State v. Hooks* (1988), 39 Ohio St.3d 67, 69-70, 529 N.E.2d 429, 432. However, we find that Carter has not demonstrated that Hill exerted a level of "coercive" influence sufficient to justify us in attributing great weight to this mitigating evidence. Although Hill may well have been the primary instigator behind the attempted robbery, we find nothing to support Carter's implied assertion that "Hill made me do it." Rather we find that the evidence instead leads to the conclusion that Carter willingly participated in the events of April 6.

F

*Disparate Sentencing of More Culpable Co-Conspirator*

**{¶ 56}** In this case we do not find mitigating value in the fact that the two other participants in the robbery, Hill and Sims, were indicted on lesser charges than was Carter, and were not put in jeopardy of a death sentence. These individuals

did not shoot and kill Messinger. The fact that Carter pulled the trigger, thereby performing the act which resulted in Messinger's death, is justification enough for his being treated more harshly than his co-conspirators. Cf: *State v. Jamison* (1990), 49 Ohio St.3d 182, 191, 552 N.E.2d 180, 188 (disparity of sentence does not justify reversal when the sentence is neither illegal nor an abuse of discretion).

**{¶ 57}** Having accorded each mitigating factor the degree of weight to which we feel it is entitled, we independently determine that the aggravating circumstance outweighs the combined weight of the mitigating factors beyond a reasonable doubt.

## XIII

### *Proportionality Review*

**{¶ 58}** Carter argues that he may not constitutionally be sentenced to death, in that the death penalty is historically imposed disproportionately in cases where, as here, a white person was murdered. This argument is foreclosed by existing precedent. See *McCleskey v. Kemp* (1987), 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262; *State v. Steffen, supra*, at 124, 31 obr 284-285, 509 N.E.2d at 395; *State v. Zuern* (1987), 32 Ohio St.3d 56, 64, 512 N.E.2d 585, 593; and *State v. Byrd, supra*, 32 Ohio St.3d at 86, 512 N.E.2d at 619.

**{¶ 59}** In terms of the statutory analysis of appropriateness and proportionality required by R.C. 2929.05(A), we find that this court has consistently upheld the imposition of death stemming solely from murder in the commission of aggravated robbery in cases whose facts are no more heinous or egregious in nature than are the facts of the case at bar. See, e.g., *State v. Jamison*, *supra*; *State v. Scott* (1986), 26 Ohio St.3d 92, 26 OBR 79, 497 N.E.2d 55; *State v. Stumpf*, *supra*. See, also, *State v. Campbell* (1994), 69 Ohio St.3d 38, 630 N.E.2d 339 (aggravated burglary); *State v. Lewis*, *supra*. Imposition of a death sentence upon Cedric Carter is consistent with the proportionality analysis we are statutorily required to undergo.

{¶ 60} Accordingly, appellant's convictions and sentences are affirmed.

*Judgment affirmed.*

DOUGLAS, WRIGHT, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

Resnick, J., concurs in judgment only.

_____