The STATE of Ohio, Appellee,

v.

BLACKMON, Appellant.

[Cite as *State v. Blackmon* (1998), 130 Ohio App.3d 142.]

Court of Appeals of Ohio,
Twelfth District, Warren County.

No. CA98–01–008.

Decided Sept. 28, 1998.

*Timothy A. Oliver,* Warren County Prosecuting Attorney, and *Gary A. Loxley,* Assistant Prosecuting Attorney, for appellee.

*Patrick D. Long,* for appellant.

WILLIAM W. YOUNG, Presiding Judge.

In September 1997, defendant-appellant, Thomas Blackmon, was indicted by a grand jury for harassment by an inmate in violation of R.C. 2921.38(A). In

December 1997, appellant filed a motion for continuance, citing a conflict with his scheduled trial and his observance of a religious holiday. The Warren County Court of Common Pleas denied the continuance, and appellant's jury trial commenced, as scheduled, in January 1998. Appellant was convicted as charged, and the trial court sentenced him to twelve months of incarceration, to be served consecutive to his current sentence. Appellant now appeals, raising three assignments of error. Finding each assignment of error to be without merit, we affirm appellant's conviction.

The record reveals the following facts pertinent to this appeal. After the 1993 prison riots in Lucasville, Ohio, appellant was transferred to the maximum security area of the Lebanon Correctional Institute ("LCI"). Thus, at all times pertinent to this appeal, appellant was an inmate at LCI. Appellant was subsequently transferred between several cells within LCI, but was eventually transferred to "cell 7."

Appellant testified that upon his arrival at cell 7, the plumbing was not operational. Specifically, the cell's toilet was backed up and the sink faucet was difficult for him to operate given the fact that his right hand is partially paralyzed. Appellant addressed these concerns to Richard Huggins, Inspector of Institutional Services, and requested a transfer to another cell. Instead, Huggins provided appellant with a bed pan for his bodily needs until the cell's plumbing could be fixed.

LCI Corrections Officer Guy Whitfield testified that during midafternoon on June 30, 1997, he escorted appellant to the prison showers. Whitfield testified that before being removed from a cell to take a shower, an inmate's hands are handcuffed and then fastened to a leather belt worn about the waist. Once the inmate is locked inside the shower, the handcuffs and leather belt are removed. On June 30, 1997, after showering and being rehandcuffed, appellant asked if he could speak with Huggins about the physical condition of his cell.

Huggins testified that appellant was escorted by Whitfield from the shower to the gate just outside Huggins's office, where appellant proceeded to complain about the physical condition of cell 7 and to request a transfer to another cell. Huggins testified:

"And he [appellant] said, 'Am I going to have to do something to get moved back there?' And I said, 'What you do is up to you. You'll have to make your own decisions about that.' At that point, he was holding, I believe, his towel and [what I believed was] * * * a shampoo bottle at the time. And, at that time, he kind of brought his hands up as far as the restraints would allow and squeezed the bottle in my direction."

Huggins testified that appellant sprayed him with a liquid from the plastic squeeze bottle and then threw the bottle in a trash can. Whitfield was ordered to immediately escort appellant to his cell.

Huggins testified that based on the odor, consistency, and color of the liquid, he concluded that appellant had sprayed him with urine. Huggins then took the following actions: (1) ordered Whitfield to retrieve the plastic squeeze bottle from the trash can, (2) proceeded to LCI's infirmary, where he requested that LCI nurse Rose Fisher ("Fisher") test the liquid in the plastic squeeze bottle to determine if it was, in fact, urine, (3) sealed the bottle in a plastic bag with the time, date, and appellant's name, (4) placed the bagged bottle in the infirmary refrigerator, and (5) contacted an Ohio State Trooper to request a transfer of the bottle to the Ohio crime lab for further testing.

Both Fisher and Ohio State Highway Patrol Crime Lab Supervisor, Paul Boggs, testified at trial about tests performed on the liquid in the plastic squeeze bottle. Fisher testified that she could smell an odor of urine about Huggins upon his entrance into the infirmary. Fisher then proceeded to perform a urinalysis on the liquid. Her test confirmed that the liquid contained in the bottle reacted as urine would react upon testing. Additionally, Fisher testified that it "looked like urine" and "smelt like urine." Boggs testified that the liquid had "[a] very characteristic odor of urine." During analysis at the crime lab, Boggs performed a "dip stick test"[1] and tested the liquid for the presence of urea and creatinine.[2] Boggs's tests revealed that the liquid exhibited all of the proper characteristics of urine, and contained both urea and creatinine.

At trial, appellant presented testimony from several inmates who testified that the relationship between Huggins and appellant was strained, at best. Several of the inmates also testified that they would, on occasion, create a foul smelling mixture of raw eggs and sour milk in their plastic shampoo bottles. The inmates would frequently spray the mixture in the prison cell vents to keep mice and rats out of their cells. Boggs testified on cross-examination that animal products, such as milk and/or eggs, would also contain urea and creatinine.

In spite of the fact that no LCI correction officer that testified at trial could confirm that the inmates were ever served raw eggs, appellant testified that on June 30, 1997, he sprayed Huggins with a mixture of raw eggs and sour milk. Appellant testified that he committed this act so that Huggins would be forced to transfer him to a disciplinary cell with operational plumbing. Appellant stead-

---

1. A dip stick test consists of seven different tests used to determine if a liquid exhibits physical characteristics similar to urine.

2. Urea and creatinine are two substances present in urine.

fastly denied that any bodily substance was contained in the plastic squeeze bottle.

Appellant was indicted by a grand jury for a violation of R.C. 2921.38(A), which provides:

"No person who is confined in a detention facility, with the intent to harass, annoy, threaten, or alarm another person, shall cause or attempt to cause another person to come into contact with blood, semen, urine, feces, or other bodily substance by throwing the bodily substance at the other person, by expelling the bodily substance upon the other person, or in any other manner."

During deliberations, the jury requested that Fisher's testimony be read back to them. However, before the trial court could respond to the jury's request, the jury arrived at its verdict. The jury convicted appellant, and this appeal followed.

In his first assignment of error, appellant contends:

"The trial court erred in overruling appellant's motion to continue the trial date when said motion was based upon appellant's exercise of his religious rights under the First Amendment to the United States Constitution; Section 7, Article I, of the Ohio Constitution; and the Religious Freedom Restoration Act (42 USC 2000)."

Under this assignment of error, appellant alleges that he is a Sunni Muslim, and as such he is required to observe Ramadan in the month of January. Appellant contends that the trial court erred in requiring him to undertake a criminal defense during January 1998, the month of Ramadan. Specifically, appellant contends that the trial court's denial of his motion for continuance violated his right of free exercise under (1) the Ohio Constitution, (2) the First Amendment of the federal Constitution, and (3) the Religious Freedom Reformation Act ("RFRA"), Section 2000bb, Title 42, U.S.Code.

We begin by setting out the standard of review for a denial of a continuance. The Supreme Court of Ohio has repeatedly held that the decision to grant or deny a continuance "is a matter which is entrusted to the broad, sound discretion of the trial judge." *State v. Unger* (1981), 67 Ohio St.2d 65, 67, 21 O.O.3d 41, 43, 423 N.E.2d 1078, 1080. Therefore, an appellate court may not reverse the denial of a continuance unless a trial court has abused its discretion. As the Supreme Court has previously stated, an abuse of discretion connotes more than a mere error in judgment; it implies an arbitrary, unreasonable or unconscionable attitude. *State v. Montgomery* (1991), 61 Ohio St.3d 410, 413, 575 N.E.2d 167, 170–171.

■ When evaluating a motion for a continuance, the trial court shall balance a number of neutral and generally applicable factors, including "the length of the delay requested; whether other continuances have been requested and received; the inconvenience to the litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors depending on the unique facts of each case." *Unger* at 67–68, 21 O.O.3d at 43, 423 N.E.2d at 1080.

In the instant case, when the trial court considered "other relevant factors" it was obligated to consider appellant's constitutional rights to the free exercise of religion. We shall begin our analysis of appellant's free exercise claims, first under the Ohio Constitution, followed by an analysis under the First Amendment, and finally, under RFRA.

## I. Free Exercise Under the Ohio Constitution

Section 7, Article I of the Ohio Constitution provides that "[a]ll men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience." Our analysis of appellant's claim that his religious rights were violated under the Ohio Constitution is governed by a three-part test first articulated by the United States Supreme Court and adopted by the Ohio Supreme Court in *State v. Schmidt* (1987), 29 Ohio St.3d 32, 34, 29 OBR 383, 384–385, 505 N.E.2d 627, 628–629:

■ "The test is first, whether a defendant's religious beliefs are sincerely held; second, whether the regulation at issue infringes upon a defendant's constitutional right to freely engage in the religious practices; and third, whether the state has demonstrated a compelling interest for enforcement of the regulation and that the regulation is written in the least restrictive means." *State v. Bontrager* (1996), 114 Ohio App.3d 367, 371, 683 N.E.2d 126, 128, citing *Sherbert v. Verner* (1963), 374 U.S. 389, 403–407, 83 S.Ct. 1790, 1793–1796, 10 L.Ed.2d 965, 969–973, and *State v. Schmidt*, 29 Ohio St.3d at 34, 29 OBR at 384–385, 505 N.E.2d at 628–629.[3]

---

**3.** We recognize at this point that the test in *Sherbert v. Verner* (1963), 374 U.S. 389, 403–407, 83 S.Ct. 1790, 1793–1796, 10 L.Ed.2d 965, 969–973, has been overruled by *Employment Div., Oregon Dept. of Human Resources v. Smith* (1990), 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876. In *Smith*, the Supreme Court held that under the First Amendment's Free Exercise Clause, neutral laws of general applicability could be applied to religious practices even when not supported by a compelling governmental interest. We note, however, that *Smith* does not affect our analysis of appellant's free exercise claim under the Ohio Constitution.

Turning our attention to this tripartite test, our review of the record reveals that, at the time his motion for continuance was filed, appellant had failed to put before the trial court any evidence that addressed the sincerity of his religious beliefs, or described in what way being forced to trial during Ramadan would infringe upon his constitutional right to freely engage in his religion.[4] Appellant's motion for continuance simply stated:

"Now comes Defendant, by and through counsel, and hereby moves the Court for a continuance of the trial date currently set for January 19th and 20th. Defendant represents to the Court that he is a Muslim and it is Islamic practice for him to fast without food and water for the entire month of January. Therefore, the Defendant requests that the trial date be continued and reset at the earliest convenience of the Court."

Appellant's motion was not supported by affidavits attesting to the sincerity of his religious beliefs, or providing the trial court with evidence of what Ramadan is, or documenting how proceeding to trial during Ramadan would substantially burden his free exercise rights. Appellant's motion even failed to identify Ramadan as the religious holiday that required him to fast without food and water for an entire month. In short, appellant failed to put forth any evidence from which the trial court could conclude that compelling him to proceed to trial during Ramadan would substantially burden his constitutional rights under the Ohio Constitution. Thus, because appellant failed to satisfy the first two prongs of the tripartite test, we find his contention that the trial court erred in overruling his motion to be without merit.

## II. Free Exercise Under the First Amendment

The First Amendment to the United States Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *." Due to recent shifts in United States Supreme Court jurisprudence, our analysis of appellant's free exercise claim under the First Amendment is substantially different from our analysis of his free exercise claim under the Ohio Constitution.

The test for analyzing appellant's free exercise claim under the First Amendment was established by the United States Supreme Court in *Employment Div., Oregon Dept. of Human Resources v. Smith* (1990), 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876, and affirmed most recently in *Boerne v. Flores* (1997), 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624. In *Smith,* the court held

---

4. In reviewing the actions of the trial court, we must restrict ourselves to those facts available to the trial court at the time it made its decision. Therefore, we shall not consider any subsequent revelation of new facts pertaining to appellant's religious practices.

that neutral laws of general applicability could be applied to religious practices even when not supported by a compelling governmental interest. In other words, neutral or generally applicable state actions are subjected to a lower level of scrutiny under the First Amendment's Free Exercise Clause than they are under the Ohio's Free Exercise Clause.

Because appellant was unable to make a showing that his right to free exercise under the Ohio Constitution had been violated, we certainly cannot find that appellant has made a showing that his right to free exercise under the First Amendment has been violated. Appellant made no argument to the trial court, and indeed not before this court of appeals, that the trial court ever considered anything other that those generally applicable factors that the Ohio Supreme Court articulated in *Unger*, 67 Ohio St.2d 65, 21 O.O.3d 41, 423 N.E.2d 1078, when overruling his motion for continuance. Therefore, we find that the trial court did not abuse its discretion. We afford the trial court's decision deference and find appellant's contention that the trial court erred in overruling his motion, based upon his right to free exercise under the First Amendment, to be without merit.

### III. Free Exercise Under RFRA

In direct response to the United States Supreme Court's decision in *Smith*, Congress enacted the Religious Freedom Restoration Act of 1993 ("RFRA"), Section 2000bb *et seq.*, Title 42, U.S.Code. Among other things, RFRA stated that one of its purposes was to "restore" the compelling interest test as set forth in *Sherbert v. Verner* (1963), 374 U.S. 389, 403–407, 83 S.Ct. 1790, 1793–1796, 10 L.Ed.2d 965, 969–973. Specifically, RFRA prohibited the government from substantially burdening a person's exercise of religion, even if that burden resulted from a rule of general applicability, unless the government could demonstrate that the burden was in furtherance of a compelling governmental interest and was the least restrictive means of furthering that interest.

However, in 1997, the United States Supreme Court held that Congress had exceeded its constitutional powers by enacting RFRA and struck down the statute as unconstitutional. *Boerne v. Flores* (1997), 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624. Accordingly, we find appellant's claim that the trial court violated his free exercise rights under RFRA to be moot.

Because appellant's contentions that the trial court violated his free exercise rights under the Ohio Constitution, the First Amendment, and RFRA are without merit, the trial court did not err in overruling his motion for continuance. Accordingly, appellant's first assignment of error is hereby overruled.

In his second assignment of error, appellant contends:

■ "The trial court erred in failing to respond to the jury question requesting to see the nurse's testimony."

In this assignment of error, appellant contends that Fisher's testimony was crucial to the outcome of the trial and that because the trial court failed to respond to the jury's request, appellant suffered prejudice. The record reveals that the jury requested Fisher's testimony be read back to them at 1:12 p.m. However, at 1:40 p.m., exactly twenty-eight minutes later, the jury indicated that it had reached a verdict. Upon review of the record, we find appellant was not prejudiced by the trial court's action.

■ When during the course of its deliberations, a jury requests further instruction, clarification, or information, a trial court has broad discretion in determining how it will respond. *State v. Carter* (1995), 72 Ohio St.3d 545, 553, 651 N.E.2d 965, 973–974. Thus, such claims are typically subject to an abuse-of-discretion standard of review. However, in the instant case, the record reveals that, at trial, appellant failed to object to the court's acceptance of the jury verdict before Fisher's testimony was read back. The Ohio Supreme Court has consistently held that an appellate court need not consider an error that the appellant could have called, but did not call, to the trial court's attention at the time when the error could have been corrected. *State v. Awan* (1986), 22 Ohio St.3d 120, 122, 22 OBR 199, 201–202, 489 N.E.2d 277, 278–279. Accordingly, appellant has waived his right to claim as error the trial court's failure to read back Fisher's testimony prior to accepting the verdict.

Notwithstanding this waiver, we note that the jury's request went unanswered for a mere twenty-eight minutes, and in spite of this delay, the jury was still able to return a unanimous verdict. The jury's arrival at a verdict effectively rendered the request moot. Additionally, upon our review of the nature of Fisher's testimony, we find that it is unlikely that a rereading would have benefited appellant's case, or altered the jury's verdict. Accordingly, the court's acceptance of the verdict before reading back Fisher's testimony did not prejudice appellant and his second assignment of error is overruled.

In his third assignment of error, appellant contends:

"There was insufficient evidence upon which to sustain a conviction for harassment by an inmate."

■ Appellant alleges that the "crux of the case" is whether the substance that appellant threw on Huggins was actually urine. Specifically, appellant contends that because (1) several inmates testified that they used a mixture of raw eggs and sour milk to keep rats and mice out of their cells, (2) Boggs admitted on cross-examination that both eggs and milk would contain urea and creatinine, and (3) appellant testified that he sprayed Huggins with a mixture of

raw eggs and sour milk, the evidence presented by the prosecution was insufficient to sustain his conviction. Upon review of the record, we disagree.

The proper standard of review for a sufficiency-of-the-evidence claim was articulated in paragraph two of the syllabus in *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492:

"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt."

Thus, it is a test of "whether the state has met its burden of production at trial." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 390, 678 N.E.2d 541, 549 (Cook, J., concurring).

At trial, the prosecution presented the testimony of Huggins, who stated that based on the odor, color, and consistency of the liquid, he concluded that the substance appellant sprayed on him was urine. Fisher testified that she could smell an odor of urine about Huggins as he entered the LCI infirmary and that the substance Huggins asked her to test "looked like urine" and "smelt like urine." Additionally, Fisher testified that the substance behaved like urine when she performed the requested urinalysis. The prosecution also presented expert testimony from Boggs, who testified that the "dip stick test" confirmed that the substance in the bottle contained both urea and creatinine.

In light of the above testimony, we find the prosecution put forth sufficient evidence that would, if believed, support the conclusion that the substance appellant caused Huggins to come into contact with was urine. Accordingly, appellant was properly convicted of harassment by an inmate as that offense is defined by R.C. 2921.38(A). Appellant's third assignment of error is overruled.

*Judgment affirmed.*

KOEHLER and WALSH, JJ., concur.