OPINION
Dan Hartley and Clarence Smith appeal from a judgment of the Clark County Court of Common Pleas, which granted Claren Walter ("Walter") and his wife, Jane Walter, judgment against Hartley in the amount of $36,694.55 plus interest and against Smith in the amount of $22,494.55 plus interest.
On April 4, 1994, the Walters filed a complaint against Hartley and Smith, alleging intentional infliction of emotional distress and loss of consortium. On May 4, 1994, Hartley and Smith filed an answer denying the allegations and setting forth defenses and a counterclaim.
On September 27, 1996, Hartley and Smith filed a motion for summary judgment arguing that their conduct could not reasonably be considered intentional and that, under R.C. 4123.741 of the workers' compensation statute, they were immune from liability for Walters' injuries. The trial court denied this motion on October 16, 1996. The evidence presented at the trial, which occurred on March 18, 19, and 20, 1997, established the following.
Walter worked for Dallas Mavis as a truck driver in Toledo, Ohio from 1974 until 1986 when he and approximately twenty-five other drivers were transferred to the Dallas Mavis terminal in Springfield, Ohio. In 1987, Dallas Mavis and Howard Sober, a Springfield trucking company where Hartley and Smith worked, merged. This merger caused friction among the drivers because Dallas Mavis drivers, including Walter, were given seniority over those coming from Howard Sober, including Hartley and Smith. Sometime in the late 1980s, the two companies came to be known as Provincial-American Truck Transport, Inc. ("Provincial"). In 1989, Provincial abandoned its "first-in, first-out" dispatch system, where a driver's arrival time at the terminal determined his position in the daily line for selecting loads, and set up a seniority dispatch system, where a driver's seniority status determined his position. Former Howard Sober drivers were upset about the seniority dispatch system and expressed their frustration by arguing with truckers who had received higher seniority status during the merger. According to Walter and other drivers who testified at trial on his behalf, shouting and yelling often took place while the drivers awaited their dispatches. Ludrick Daniel Bricker, a Dallas Mavis driver who had come to Springfield from Kenosha, Wisconsin, relayed his observations of the confrontations between Hartley and Walter:
 Mr. Hartley would start in on using bad language and giving Mr. Walters a bad time and he would — Walters would not say nothing to him. He just set there and took it, and it got to the point where it would get to be a yelling match and some of the guys would get up and walk out, some of them would stay there. He done it quite frequently.
Walter testified that, between 1991 and 1993, he had filed complaints with his terminal manager, the local union, and the sheriff's department alleging that Hartley and Smith had been threatening and harassing him. Because Walter felt unsatisfied by the responses to his complaints, he began carrying a pocket tape recorder and recording some of his conversations with Hartley and Smith. Three recorded conversations were played to the jury. Walter and Smith's September 24, 1992 conversation included Smith's threat to break Walter's jaw and insults against Walter. The February 4, 1993 conversation between Walter and Hartley included Hartley's accusations against Walter for using his position as a union steward to change rules without consulting the other drivers. Walter recorded Hartley stating, "Why don't you go back to Toledo where you come? We didn't have no damn problems here until you come here." Smith also recorded, on February 9, 1994, Hartley calling him a "goddamn fucking turn coat yellow-bellied goddamn rat" and the "[w]orst piece of fucking trash I ever seen from Toledo."
On February 18, 1994, Walter met with Dick Weisenberger, his terminal manager, to discuss how Hartley and Smith had been treating him since his November 1993 return to work after a leave of absence. On April 12, 1993, Walter had been seriously injured in Sturgis, Michigan while unloading a chassis from a truck. According to Walter, when he had told Weisenberger that "their approach toward [him] had become more severe," Weisenberger responded that there was not much that he could do. Walter testified that he then became emotional and uncontrollable because "the situation just basically got to me, the fact that there was no way of controlling the intimidations, no way of controlling their attitude, and recovering from the accident." Weisenberger instructed Walter to go home and to take a few weeks off work. Walter drove home and called Dr. E.W. Cabotage, his family doctor, who made arrangements for him to see Dr. Donald Evert, a psychiatrist practicing in Findlay, Ohio. Walter first met with Dr. Evert on February 23, 1994 and continued to see him until March 1996. Walter testified that he had not returned to work in Springfield until June 4, 1994.
A videotape of Dr. Evert's deposition testimony was played to the jury. Dr. Evert testified that, during his first meeting with Walter, he had obtained a history of Walter's problems, including his symptoms, precipitating events, past medical history, medications, social habits, and family history. Walter told Dr. Evert about the Sturgis accident and that, upon his return to work in November 1993, "on top of his recent physical impairment and trauma, things [i.e., threats and harassment] had escalated considerably at work." Dr. Evert related that, according to Walter, some physical pain from the Sturgis accident "had made his return to work also somewhat more complicated" and that his ability to handle things had worsened since his Sturgis accident. Walter had denied any other stressors in his life and had stated that except for the problems with his co-workers, he had enjoyed his job. Dr. Evert also gave his diagnosis of Walter's condition:
 [M]y initial impression was that he was suffering from a major depression, which was nonpsychotic, and part of the differential was to rule out an adjustment disorder with mixed features of anxiety and depression. Secondary diagnosis was severe work-related stress.
Dr. Evert further stated his opinion that Walter had suffered mental injury due to "the stressors and things that he was experiencing regarding his work." During cross examination, Dr. Evert stated that Walter's physical injuries may have, "to perhaps a limited degree," caused psychological manifestations.
Hartley and Smith attempted to show at trial that other sources of stress in Walter's life — farmwork, two trucking accidents, and the physical injuries from the Sturgis accident — had caused his mental condition. They also elicited testimony from other drivers who had observed Walter initiating many of the confrontations with Hartley and Smith. Hartley and Smith testified that they had directed "rough" language at Walter because he had been unlawfully driving excessive hours so as to return earlier to Springfield to select the best available loads.
Following the three-day trial, the jury found Harley and Smith liable to the Walters. They awarded Walter $5,300 in compensatory damages and $6,600 in punitive damages against Smith and $10,700 in compensatory damages and $13,400 in punitive damages against Hartley. The jury also awarded to Jane Walter $1,500 against Smith and $3,500 against Hartley. On June 9, 1997, the trial court granted judgment to the Walters.
Hartley and Smith raise four assignments of error on appeal.
 I. THE COURT ERRED BY READING ONLY A PORTION OF A TRANSCRIPT OF THE VIDEO DEPOSITION TESTIMONY OF THE PLAINTIFFS' EXPERT WITNESS TO THE JURY DURING DELIBERATION WITHOUT MAKING AVAILABLE THE ENTIRE TRANSCRIPT OR PORTIONS PERTAINING TO THE MENTAL AND PHYSICAL HISTORY OF MR. WALTER AS RELATED BY THE EXPERT.
Hartley and Smith contend that the trial court erred by providing only part of Dr. Evert's deposition testimony in response to the jury's request for the deposition transcript.
When the jury sent out a request for the transcript of Dr. Evert's deposition, the trial court responded by asking, "Is there a particular part of the testimony that you have a question about?" The jury then requested "Dr. Evert's diagnosed or theorized cause of the mental condition and elaboration of work-related stress." The trial court instructed the court reporter to read the following dialogue to the jury:
 Q. Dr. Evert, do you have an opinion, based upon a reasonable degree of medical probability, as to whether the psychic injuries you've described which you've treated are the direct and proximate [result] that Mr. Walter related to you in his history?
A. Yes, I have an opinion.
 My opinion is, is that the stressors and things that he was experiencing regarding his work as he related to me in his initial history were directly related to the subsequent illness that I was treating him for.
 Q. Doctor, do you have an opinion, based upon reasonable degree of medical probability, as to whether or not Mr. Walter suffered mental injury as a result of the history you've described?
A. Yes, I have an opinion.
Q. What is that opinion, Doctor?
A. That he did suffer mental injury.
 Q. And do you have an opinion, based upon a reasonable degree of medical probability, as to whether or not the history you were given was a direct and proximate result of Mr. Walter's inability to work?
A. Yes, I have an opinion.
Q. And your opinion on that?
 A. That he was not able to work due to the history that he related of he situation at work and the problems that resulted from that. Yes. [Counsel's objections omitted.]
Harley and Smith objected to the reading of this testimony.
We review a trial court's conduct in response to the jury's request for additional information for an abuse of discretion.State v. Carter (1995), 72 Ohio St.3d 545, 560; State v. Higgins
(1990), 61 Ohio App.3d 414, 421. "[A]fter jurors retire to deliberate, upon request from the jury a court may, in the exercise of sound discretion, cause to be read all or a part of the testimony of any witness, in the presence of or after reasonable notice to the parties or their counsel." State v.Berry (1971), 25 Ohio St.2d 255, 263.
In State v. Davis (Aug. 15, 1996), Franklin App. No. 96APA02-233, unreported, the appellate court upheld the trial court's decision to re-read a witness' testimony, pointing out that the trial court had cautioned the jury not to place undue emphasis on any particular witness' testimony and had re-read the entire direct and cross examination testimony of the witness. Under those circumstances, the Davis court concluded that "the record fails to support the contention that the reading back of the testimony placed undue emphasis on [one side's] case." Davis, supra. InState v. Horton (Dec. 19, 1995), Franklin App. No. 95APA04-455, unreported, the appellate court concluded that re-reading the entire direct and cross-examination testimony of a prosecution witness had not unduly emphasized the state's case. In U.S. v.Nickell (C.A.9, 1989), 883 F.2d 824, 829, the court explained that, in determining "whether to allow the jury to review testimony during deliberations, the court should avoid giving undue emphasis to particular testimony."
In this case, the trial court provided the jury with a portion of Dr. Evert's deposition testimony that did not include "an elaboration of work-related stress." By repeating Dr. Evert's ultimate conclusion that stressors and work-related experiences, which Walter had related to him during their initial consultation, had caused Walter's mental condition, without repeating Dr. Evert's testimony about other potential causes, the trial court gave "undue emphasis" to Walter's position. Furthermore, the trial court did not caution the jury to avoid unduly emphasizing the repeated portion of Dr. Evert's testimony, nor did it re-read any of Dr. Evert's cross-examination testimony. See Davis, supra;Horton, supra; Nickell, 883 F.2d at 829. In our opinion, the trial court abused its discretion by failing to respond to the jury's particular request for "an elaboration of work-related stress" and by providing information that unduly emphasized Walter's theory of causation.
The first assignment of error is sustained.
 II. THE COURT COMMITTED ERROR BY DENYING THE DEFENSE A CROSS EXAMINATION OF THE PLAINTIFF CLAREN WALTER UPON THE SUBJECT OF PLAINTIFF'S WORKERS' COMPENSATION CLAIM FORMS SUBMITTED BY THE PLAINTIFF.
 III. THE COURT COMMITTED PREJUDICIAL ERROR BY NOT ADMITTING DEFENSE EXHIBITS A AND B WHEN THE EXHIBITS WERE RELEVANT AND OTHERWISE COMPETENT AND ADMISSIBLE.
Hartley and Smith's second and third assignments of error involve Walter's workers' compensation claims pertaining to his injuries from the Sturgis accident. They contend that the trial court erred by refusing to admit into evidence a Bureau of Workers' Compensation ("BWC") "Application to Re-Activate Claim" form signed by Walter on February 25, 1994 ("Exhibit A") and a BWC letter accepting Walter's claim for a "single episode depressive reaction" ("Exhibit B"). They also assign error to the trial court's decision to prohibit the questioning of Walter, during the re-cross examination of him, regarding the substance of the claims submitted to the BWC on Exhibit A. Hartley and Smith argue that these rulings deprived them of the opportunity to show that Walter's mental condition was actually caused by his Sturgis accident.
Determining whether to admit documents into evidence and whether to allow witness testimony on a particular subject is a question within the sound discretion of the trial court. Evid.R. 104; State v. Heinish (1990), 50 Ohio St.3d 231, 239. Accordingly, we will not disrupt the trial court's ruling on objections to the admissibility of evidence absent an abuse of discretion. State v. Davis (1992), 81 Ohio App.3d 706, 716. An abuse of discretion involves an unreasonable, arbitrary, or unconscionable attitude. Id. at 716.
Exhibit A was Walter's request to the BWC to re-active claim number 93-11925 pertaining to his April 28, 1993 injuries. Exhibit A sought the "allowance of an additional disability or condition which was not previously considered" for Walter's residual chest wall pain, major depression, anxiety disorder, and back pain. Walter noted on this form that he had previously filed a claim with BWC under the claim number 91-82098. Exhibit B was a letter from the BWC allowing Walter's claim number 93-11925 for a single episode depressive reaction.
During the cross examination of Walter, Hartley and Smith asked him whether "the claim number for this anxiety and depression matches the claim number that [he had] filed for [his] physical injuries?" Walter answered yes. They next asked him whether Dr. Cabotage's letter ("Exhibit C") was referring to Walter's physical injuries when it stated that Walter's "nerve condition is job related [and is] a result of injuries he sustained at work." Walter answered that Dr. Cabotage's letter had referred to the harassment suffered at work. On redirect, Walter explained that when he had completed Exhibit A, he already had a pending workers' compensation claim for physical injuries resulting from the Sturgis accident. Walter also pointed out that Dr. Alan Schneiberg had completed a psychological evaluation report on June 24, 1994 upon the request of the BWC "for the purposes of establishing a secondary claim allowance for major depression reaction." On re-cross, Walter admitted that he had not filed a new claim for his mental condition that arose in February 1994. The following dialogue then took place:
 Q. You requested under * * * Defendant's Exhibit A for allowance — additional conditions which is part of your April 28, `93 claim. Is that correct?
A. That was filed on 2/18/94 for that injury date.
 Q. What 2/18/94 simply applies for a temporary total disable. Is that correct? That's your temporary total disability is starting. Do you understand that, that's what you wrote on this paper?
MR. SKOGSTROM: Objection.
THE COURT: Basis?
 MR. SKOGSTROM: That's not a question, Your Honor. He's attempting to explain to the witness the document. If he doesn't understand it, he doesn't understand it. If he wants to ask a question, that's fine.
THE COURT: Sustained.
BY MR. LAGOS:
Q. Mr. Walter sir, what you did was you asked —
MR. SKOGSTROM: Objection.
THE COURT: Sustained.
BY MR. LAGOS:
 Q. This document that you filed is asking [for] the condition of major depression and anxiety disorder being allowed for an injury that happened on April 28, 1993.
MR. SKOGSTROM: Objection.
THE COURT: Approach the bench, please.
At the bench conference, Mr. Lagos stated that he was trying to elicit from Walter that, on Exhibit A, he had certified to the BWC that the major depression and anxiety disorder had been caused by the Sturgis accident. The trial court told Mr. Lagos that he could not "explain to the jury what that document is" and that "if [Walter] doesn't understand it, and if that's what he's saying that's not what he did, you're left with that." No further questions about Exhibits A and B were asked after the bench conference.
When Hartley and Smith sought the admission into evidence of Exhibits A through C, Walter objected to the relevancy of Exhibits A and B. Hartley and Smith explained that the documents were relevant for the following reason:
 The videotape deposition of Dr. Evert's, on a least a couple occasions, specifically made reference to the Bureau of Workers' Compensation, Bureau of Workers' Compensation psychiatrist, and I believe they opened the door to allow other evidence on workers' comp.
The trial court admitted Exhibit C, but not Exhibits A and B, into evidence.
Walter's reasons for using the Sturgis accident claim number to request additional compensation for his mental condition were relevant to Hartley and Smith's theory that the Sturgis accident, rather than their conduct, had caused Walter's mental condition. Evid.R. 401. Hartley and Smith should have been permitted to have Exhibits A and B admitted into evidence. The trial court's decision to exclude Exhibits A and B from evidence, however, constituted harmless error, Evid.R. 103(A), because Hartley and Smith had elicited from Walter that he had piggybacked the major depression and severe anxiety claims onto the Sturgis accident claim rather than filing a separate claim. Furthermore, although in our judgment Mr. Lagos' statements were more in the nature of leading questions, permissible on cross examination, than his attempts to testify, the trial court's decision to prohibit further questions regarding Walter's knowledge of the substance of Exhibit A also constituted harmless error because the jury had already heard Walter admit that he had not filed a new claim.
Because the trial court did not commit prejudicial error by making the challenged evidentiary rulings, the second and third assignments of error are overruled.
 IV. THE COURT COMMITTED PREJUDICIAL ERROR BY INSTRUCTING THE JURY THAT RECKLESS ACTS OF THE DEFENDANTS MAY ALLOW A FINDING OF LIABILITY WHEN THE COMPLAINT OF PLAINTIFFS ONLY PLED INTENTIONAL CONDUCT WAS UNDERTAKEN, AND WHEN THE WORKERS' COMPENSATION LAW ONLY ALLOWS RECOVERY FOR INTENTIONAL CONDUCT.
Hartley and Smith contend that the trial court erroneously instructed the jury that Walter could recover from them upon a finding that their conduct had been either reckless or intentional.
Over the objection of Hartley and Smith, the trial court instructed the jury as follows:
 Whenever an individual intentionally or recklessly acts in an extreme and outrageous manner so as to cause serious emotional distress to another, he may be held liable for any mental or physical injury caused. * * *
 I have used the terms "intentionally" and "recklessly." You are instructed that a person acts intentionally when he has the purpose to produce a specific result. A person intends an act when it is done purposefully, not accidently. The intent with which a person does an act is known only to himself unless he expresses it to other [sic] others or indicates it by his conduct.
 A person acts recklessly when with heedless indifference to the consequences he perversely disregards a known risk that his conduct is likely to cause serious emotional distress.
Hartley and Smith objected to the term "recklessly" because, under Section 35, Article II of the Ohio Constitution and R.C. 4123.741, they were immune from civil liability to Walter unless he could establish that their conduct was intentional.
Section 35, Article II of the Ohio Constitution authorized the General Assembly to establish a workers' compensation fund to compensate injured employees "in lieu of all other rights to compensation, or damages, for such death, injuries, or occupational disease." Any employer who pays the required premiums into the system "shall not be liable to respond in damages at common law or by statute." R.C. 4123.741 provides:
 No employee of any employer, as defined in division (B) of section 4123.01 of the Revised Code, shall be liable to respond in damages at common law or by statute for any injury or occupational disease, received or contracted by any other employee of such employer in the course of and arising out of the latter employee's employment, or for any death resulting from such injury or occupational disease, on the condition that such injury, occupational disease, or death is found to be compensable under sections 4123.01 to 4123.94, inclusive, of the Revised Code.
In Blankenship v. Cincinnati Milacron Chemicals, Inc. (1982),69 Ohio St.2d 608, syllabus, the supreme court explained that an "employee is not precluded by Section 35, Article II of the Ohio Constitution, or by R.C. 4123.74 and 4123.741 from enforcing his common law remedies against his employer for an intentional tort." The theory supporting this rule is that the substance of an intentional tort claim is not an injury received "in the course of and arising out of the [fellow] employee's employment." See R.C.4123.741; Blankenship, 69 Ohio St.2d at 613. An employee bears a heavy burden of establishing that the injurious conduct was intentional:
 To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent.
Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115, paragraph two of the syllabus. Although the supreme court case, in recognizing the tort of intentional infliction of emotional distress, spoke in terms of reckless or intentional conduct, Yeager v. Local Union 20
(1983), 6 Ohio St.3d 369, 374, recklessness is not equivalent to intentional for the purposes of an exception to R.C. 4123.741. See Fyffe, 59 Ohio St.3d at paragraph two of the syllabus.
Because R.C. 4123.741 immunizes reckless conduct by fellow employees, the trial court erred by instructing the jury that Hartley and Smith could be found liable for recklessly causing Walter's injuries. Under R.C. 4123.741, they were immune from liability to Walter unless Walter could establish that they had acted intentionally. By instructing the jury that Hartley and Smith could be held liable for reckless conduct, the trial court lowered the standard for proving an intentional tort committed in the workplace setting. Thus, the trial court erred and substantially prejudiced the rights of Hartley and Smith.
The fourth assignment of error is sustained.
The judgment will be reversed and remanded for further proceedings consistent with this opinion.
YOUNG, P.J. and BROGAN, J., concur.
Copies mailed to:
James W. Skogstrom
Daniel J. Martin
Hon. Richard O'Neill