JUDGMENT ENTRY.
This appeal is considered on the accelerated calendar under App.R. 11.1(E) and Loc.R. 12, and this Judgment Entry shall not be considered an Opinion of the Court pursuant to S.Ct.R.Rep.Op. 3(A).
Defendant-appellant Bryan Whitlow appeals his convictions following a jury trial, for one count of murder in violation of R.C. 2903.02(B) and for six counts of felonious assault in violation of R.C. 2903.11(A)(1) and (2).[1] Whitlow raises four assignments of error for our review. Because none of the assignments have merit, we affirm.
On the evening of September 1, 2002, in the Fairmont area of Hamilton County, there was a barbecue in a park. A fight started on the street near the home of Eddie and Verlene Wilcox. Shots were fired. One woman died and four others were wounded. Whitlow was charged in connection with the shootings.
During Whitlow's trial, the state presented testimony from four eyewitnesses: Antonio Wilcox, Eddie Wilcox, Latoya Andrews, and Andreye Hudson. Antonio Wilcox, testified that a fight started between himself and Andre Summers. Some moments later, his uncle Eddie shot Summers. Then more shots rang out. Antonio testified that he had seen Whitlow in the crowd holding a black semi-automatic handgun at his side, immediately prior to the shootings. Antonio, who had been shot in the ankle, identified Whitlow as the shooter in a photo lineup shown to him several weeks after the shooting, as well as in court.
Eddie Wilcox testified that he saw Whitlow and one other person in the crowd that night carrying a gun, so he went to get his own. When the fight started, Eddie stated, that he fired his gun. He was then hit with shots himself. Eddie testified that he did not actually see Whitlow fire a gun, but he did see him pull his gun down from an extended position and point it in his direction. Eddie testified that when the shooting stopped, he had been shot once in each leg and in the stomach; that his wife, Verlene, had been shot in the stomach; that his sister-in-law, Rita Michele Sullivan Walters, had been shot in the chest, and that his nephew Antonio had been shot in the ankle. Eddie testified that after he told his family to get inside their fenced yard, he went into their home and called for emergency assistance. Although Eddie admitted, that he could not identify Whitlow from a photographic lineup police had shown him several weeks after the shooting, he stated that he was positive that Whitlow was the shooter. Eddie further acknowledged that he was remorseful for shooting Summers that night, that he had pleaded guilty to aggravated assault as a result of the shooting, and that he had been given probation for his sentence.
Latoya Andrews, a teenager who lived in Fairmont at the time of the shooting, testified that she had gone to the park that day, September 1, 2002, and witnessed the fight and the shootings. From her perspective, Antonio had been attacked by a group of young men, including Summers. She saw an "older guy" shoot Summers. She testified that Whitlow, whom she knew from the neighborhood recreation center, began shooting. She testified that the first shot did not hit anyone, but that she then watched as a woman holding a baby fell down, and then "Antonio went down to the ground." She identified Whitlow as the shooter both in a photo array soon after the incident and at trial. During cross-examination, Latoya changed her story and stated that she did not see the shooting. Latoya further admitted that she did not always tell the truth. During redirect, the assistant prosecutor confronted Latoya with her earlier statement in which she had told police that she had seen Whitlow shooting people. She then testified that she did witness the shootings.
Andreye Hudson, another teenager, testified that he was also present during the fighting and the shooting. Hudson testified that he saw Antonio's uncle pull out his gun and shoot Summers. Hudson then testified that he did not know who had fired the other shots because they came from behind him. The state impeached his testimony by introducing a prior statement in which Hudson had named Whitlow as the shooter. Hudson then reluctantly identified Whitlow as the shooter. Hudson admitted that he did not want to testify against his friend. During cross-examination, Hudson stated, among other things, that he gave the police Whitlow's name because he feared he was a suspect in the shootings.
Verlene Wilcox and Sharon Montavon also testified on behalf of the state. Verlene testified that she and her sister, Rita, were getting ready to leave for church when the fight broke out. Verlene testified that she and Rita, who was holding her seven-month-old baby, were walking to Rita's car when she heard her husband telling her to get behind the gate to their yard. She then heard someone yell, "This is our m f'ing turf," which was immediately followed by gunshots. Rita told her that she had been shot and asked Verlene to take the baby. Verlene testified that she managed to take her sister's baby from her, even though she had been shot in the stomach. Verlene then saw her sister point to her chest and fall to the ground. Shortly thereafter, Verlene called 911 and her church. During cross-examination, Verlene admitted that even though she had not seen the shooter that night, she told police that Michale Swan had shot her because of an argument between her granddaughter and Swan earlier that day. Montavon, the director of the Fairmont neighborhood recreation center testified that Whitlow, whom she had earlier befriended, called her during the six-month period that he had eluded police. Whitlow explained to Montavon during one of phone calls that he just "snapped" after he saw his friend Andre get shot.
The state also presented testimony from Deputy Coroner Dr. Michael Balko, Criminalist Clarence Caesar, and Senior Firearms Examiner William Schrand. Balko performed the postmortem examination of Rita's body. He testified that Rita's death was caused by a "penetrating gunshot wound to the chest with perforation of the right side of the heart and that resulted in massive bleeding into the sac around heart, the pericardio sac, massive bleeding around the chest cavity, and penetration of the right lung." Caesar testified that he had responded to the scene of the shooting to collect evidence and to take photographs. He recovered seven .380-caliber casings in the street, four discharged bullets, and one .25-caliber casing. During a search of Eddie and Verlene's home, he followed a blood trail to the kitchen and located a Raven .25-caliber gun. Schrand examined the .25-caliber pistol, the .25-caliber casing, one .25-caliber bullet from the hospital, seven .380-caliber casings, four discharged .380-caliber bullets, and one .380-caliber bullet recovered during Rita's autopsy. He concluded that the .25-caliber casing and the bullet removed from Summers at the hospital were fired from the .25-caliber Raven pistol. Schrand further concluded that all five .380-caliber bullets were fired from the same .380-caliber automatic firearm.
The defense called Latoshia Andrews as its only witness. Latoshia testified that her older sister, Latoya Andrews, was not in the park the night of the shooting. She also testified that Latoya was a pathological liar.
In his first assignment of error, Whitlow argues that the trial court erred in overruling his motion for a mistrial. This assignment is based on two incidents that may have affected the jurors during the trial. The first incident, which took place during a lunch break, involved a physical fight in front of the courthouse between a member of the victim's family and a member of the defendant's family. Immediately upon being notified of the incident, the trial court met with counsel, and they agreed to ask the jurors if any of them had seen or heard of the incident and then to question them individually in chambers with counsel for both sides present. The court asked the jurors in open court for a show of hands as to who was aware of the incident and then asked the jurors not to discuss the incident among themselves. Each juror was called into chambers in turn and questioned by the court. One juror stated that she had witnessed the fight. Four jurors stated they had seen an injured man, whom they recognized from the trial, enter the courthouse, but they stated that they did not know what had happened; and some jurors stated they had only heard about the incident from other jurors. All the jurors said that any knowledge of the incident would not affect their duties as jurors and would not bias them toward either side. Some jurors expressed a desire for more security, and the court promised that a deputy would now escort them inside the courthouse. The trial court told the jurors they were not to discuss the incident, particularly amongst themselves. The trial court, at the behest of both parties, re-questioned the juror, who had witnessed the altercation to determine if she wanted to be removed from the jury. The juror stated that she did not and assured the trial court that the incident would not affect her ability to be fair and impartial. Both the state and the defense appeared satisfied with the handling of the incident, so the trial proceeded.
A second incident occurred after court was concluded that same day. Two jurors were waiting for a ride on a bench outside the courthouse when some young men, who had been present at the trial approached them. The jurors stated that the men tried to intimidate them by talking loudly to each other about the lunch incident and that their conversation was clearly meant for them. The following morning, the two jurors brought the incident to the court's attention. The court immediately called the two jurors into chambers with counsel present and questioned them about the incident. One juror stated that she did not hear what the men had said. Neither juror knew which side the young men were associated with. Both jurors said they could continue to serve in a fair manner and would have no bias toward either side. They did request additional security, and the trial court said that a deputy not only would be with them inside the courthouse, but would also escort them to their cars in the evening. At that point, defense counsel asked for a brief recess to consult with Whitlow. When defense counsel returned, he informed the court that his client wanted a mistrial. The trial court overruled the motion.
Whitlow argues that seven jurors had knowledge of the incident at lunch and two were present for the later incident after court, and that the cumulative effect of these incidents compromised their fairness and impartiality. In State v. Phillips,[2]
the Ohio Supreme held, "When a trial court learns of an improper outside communication with a juror, it must hold a hearing to determine whether the communication biased the juror. [Citations deleted.] `In a criminal case, any private communication * * * with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial * * *. The burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.' [Citation deleted.] The Sixth Circuit, however, has held that the defense must prove that the juror has been biased. [Citations deleted.] In cases involving outside influences on jurors, trial courts are granted broad discretion in dealing with the contact and determining whether to declare a mistrial or to replace an affected juror. [Citations deleted.]"
In this case, the trial court spoke individually to the twelve jurors after the first incident, and to the two affected jurors after the second incident. Counsel for both sides were present during this questioning. All of the jurors interviewed stated that they could be fair and impartial for the remainder of the trial and would harbor no bias against either side. In view of the excellent way the trial court handled a difficult situation, we cannot say that it abused its discretion in overruling the motion for a mistrial. We, therefore, overrule the first assignment of error.
In the second assignment of error, Whitlow contends the trial court erred in failing to give a sufficient curative instruction to the jury for allegedly improper statements made by the assistant prosecutor during closing argument. In one statement, the assistant prosecutor commented that the state's evidence was uncontroverted. In another statement, the assistant prosecutor commented, "[T]hose witnesses they came in here and it was good enough to base an arrest on. They were good enough for Juvenile Court; they were good enough for the Grand Jury. But, now, for some reason they are not good enough for you." Defense counsel did not object to either statement. After closing argument, the trial court told the jury that although a case started with an indictment by a grand jury that had nothing to do with the guilt or innocence of the defendant. The jurors were also instructed that anything the attorneys said in closing argument was not evidence, and that they should base their verdict solely on the evidence.
In State v. Carusone, this court explained that "[t]he test for prosecutorial misconduct is whether the prosecutor's remarks were improper, and, if so, whether they prejudicially affected the defendant's substantial rights. [Citations deleted.] Considerable latitude is generally afforded to the prosecutor in presenting closing arguments. [Citations deleted.] The prosecutor's closing argument must be reviewed in its entirely to determine if any remarks were prejudicial. [Citations deleted]."[3] Because Whitlow did not object to the remarks, we must review the alleged misconduct for plain error.
We have reviewed the entire closing argument, including the contested statements. We cannot say the trial court erred in failing to give the jury a curative instruction with respect to the prosecutor's statement that the evidence was "uncontroverted." We have held that statements such as this constitute "a permissible comment by the state on the strength of its case, rather than an improper comment on the defendant's silence."[4] While we agree that the assistant prosecutor's comments about the sufficiency of the grand-jury and juvenile-court testimony of the state's witnesses were improper and constituted misconduct, they did not rise to the level of plain error. Furthermore, the trial court gave an appropriate curative instruction with respect to these comments. Under these circumstances, we conclude that the comments were not prejudicial, but we caution prosecutors to refrain from making such misstatements of the law in the future. Consequently, we overrule Whitlow's second assignment of error.
In his third assignment of error, Whitlow claims that he was denied the effective assistance of counsel because his counsel failed to object to the state's allegedly improper comments during closing argument. To prevail on his claim, Whitlow "must show that [his] counsel's representation fell below an objective standard of reasonableness"[5] and that he was prejudiced by counsel's deficient performance.[6] Prejudice is demonstrated by a showing "that there is a reasonable probability that, but for * * * [the] errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[7] Both prongs must be met to demonstrate ineffective assistance of counsel.[8] Moreover, "it is presumed that a properly licensed attorney is competent, and ineffective assistance cannot be based on debatable tactical decisions * * *."[9] A defendant is not deprived of effective assistance of counsel when defense counsel exercises calculated trial strategy.[10] Because defense counsel's failure to object in this case can be viewed as trial strategy, and because an objection would not have changed the outcome of the trial, we overrule the third assignment of error.
In the fourth assignment of error, Whitlow claims that his convictions were against the manifest weight of the evidence, because there was no physical evidence tying him to the crimes, and because the eyewitness testimony was not credible. When addressing a weight-of-the evidence challenge, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created a manifest miscarriage of justice.[11] We must "disagree with the factfinder's resolution of the conflicting [evidence]" before we can reverse.[12] Further, a jury is free to believe all, part, or none of any witnesses's testimony.[13] We have reviewed the entire record with the applicable standard in mind and conclude that Whitlow's convictions were not against the manifest weight of the evidence. We, therefore, overrule Whitlow's fourth assignment of error and affirm the judgment of the trial court.
Further, a certified copy of this Judgment Entry shall constitute the mandate, which shall be sent to the trial court under App.R. 27. Costs shall be taxed under App.R. 24.
Winkler, P.J., Gorman and Sundermann, JJ.
[1] All the counts included firearm specifications.
[2] 74 Ohio St.3d 72, 88-89, 1995-Ohio-171, 656 N.E.2d 643.
[3] 1st Dist. No. C-010681, 2003-Ohio-1018, ¶ 40.
[4] State v. Love (1988), 49 Ohio App.3d 88, 90,550 N.E.2d 951.
[5] Strickland v. Washington (1984), 466 U.S. 668, 688,104 S.Ct. 2052.
[6] See id. at 687.
[7] See id. at 694.
[8] See id. at 697.
[9] State v. Bond, 1st Dist. No. C-990195.
[10] State v. Hall, 1st Dist. No. C-990639; State v.Carter, 72 Ohio St.3d 545, 558, 1995-Ohio-104, 651 N.E.2d 965.
[11] State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[12] State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541.
[13] State v. Antill (1964), 176 Ohio St. 61, 67,197 N.E.2d 548.