JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Rayshawn D. Ogletree, appeals from the judgment of the Common Pleas Court, rendered after a jury verdict, finding him guilty of murder, aggravated robbery, aggravated burglary, and engaging in a pattern of corrupt activity. Ogletree challenges only his conviction for murder, arguing that the evidence was insufficient to sustain his conviction and his conviction was against the manifest weight of the evidence because he did not have the requisite intent to commit murder. For the reasons that follow, we affirm.
 {¶ 2} Ogletree was indicted on one count of murder, six counts of aggravated robbery, two counts of aggravated burglary, and one count of engaging in a pattern of corrupt activity. With the exception of the count involving corrupt activity, all of the counts carried one- and three-year firearm specifications. The indictment arose from a series of events on the west side of Cleveland that began with the robbery of the Elbireh Society on February 3, 2004 and ended February 9, 2004 with the murder of Peter Koutsoulias at Dimitri's Restaurant.
 {¶ 3} The evidence presented at trial demonstrated that Greg Reinke, a crack addict with a $300 a day habit, bought crack from Ogletree and Ogletree's cousin, co-defendant John Dawson, who would extend Reinke credit for his purchases. Reinke stole money from various businesses and persons to pay off his debt. His petty theft offenses escalated, however, after Ogletree and Dawson supplied him with a 9 mm. automatic handgun to use during the robberies.
 {¶ 4} Reinke, who reached a plea agreement with the State in exchange for his testimony, testified that during the first week of February 2004, he was high most of the time, and slept only three to four hours a day. During this time, he robbed the Elbireh Society three times, a Rite Aid store, West End Lumber, a man on the street, and the My Friends Deli. Dawson would give him the gun before each robbery. When the robbery was completed, Reinke would return the gun and divide the money between Ogletree, Dawson, John Rowe (a friend of Ogletree's and Dawson's), Reinke's girlfriend Tiaisha Ogletree, and himself. Reinke testified that he would use his money to pay his debt to Ogletree and Dawson, but would then immediately get more crack from them on credit.
 {¶ 5} According to Reinke, on February 8, 2004, he and Ogletree talked about "hitting a lick"[1] at Dimitri's Restaurant the next day. Reinke and Tiaisha smoked some crack on the morning of February 9, 2004, and then Tiaisha called Ogletree, who came to the apartment with Rowe. Reinke testified that he became paranoid while Ogletree was getting the gun ready, so he left the apartment. Ogletree and Rowe picked him up a few minutes later as he was walking down the street.
 {¶ 6} Reinke testified that he got in the car and they drove to Dimitri's. They parked on a side street near the restaurant, Ogletree gave him the gun, and he got out of the car.
 {¶ 7} Reinke testified that he looked in the window as he walked past Dimitri's and thought, "it don't look right, there's a lot of people in there." He walked across the street to Murray's Auto Parts, pulled the gun on a woman at the register, and told her to give him all of the money. She was unable to open the register, however, so he ran out of the store and back across the street to Dimitri's.
 {¶ 8} In Dimitri's, he asked a female clerk at the counter for a soda pop. When she went to the cash register to take his money, Reinke pulled out the gun and said, "Give me all the money." The woman reached under the cash register and pulled out a box that contained only loose change. Reinke testified that he then again told the woman to open the register. When she did, he saw that there were only a few bills in the register, so he picked up the register tray and looked in the register for more money. There was no money under the tray, however, so Reinke decided to leave.
 {¶ 9} According to Reinke, "I'm on my way out the door. I'm backing up out the door and I pulled the door open. And as I'm about to walk out, is when Mr. Koutsoulias came running from the side of the — from the restaurant, and I shot him."
 {¶ 10} Reinke testified that he ran back to the car, which Ogletree was now driving. After Rowe let him in the car, Reinke told them that he thought he had just killed someone. Reinke testified that he gave the gun back to Ogletree, who examined the gun and determined that four bullets were missing. Reinke took approximately $60 for himself, and gave Ogletree and Rowe $100 each.
 {¶ 11} Ogletree drove to his aunt's house and he and Rowe went inside the house. Reinke testified that he was not invited in, so he walked down the street a short way, but then went back to the house and knocked on the door. When Ogletree answered, Reinke told him that he wanted a "50 block" of crack. Ogletree came outside and spit a $50 rock of crack on the ground; Reinke gave Ogletree the money and walked away.
 {¶ 12} Rowe, who also testified in exchange for his plea, testified that on February 9, 2004, Ogletree called him and asked him to "take me to hit a lick with white boy." Rowe agreed. After picking up Ogletree, they drove to the apartment where Reinke lived with Tiaisha, Dawson, and Dawson's mother. Rowe testified that while they were in the apartment, he saw Ogletree load a 9 mm. gun and then tape the clip because it was broken.
 {¶ 13} Rowe testified that he, Ogletree and Reinke got in his car and drove around. He could not remember whether Ogletree or Reinke gave him directions, but eventually he stopped the car as directed, and Reinke got out. According to Rowe, Ogletree handed Reinke the gun and told him, "Don't kill nobody" and "hurry up." Rowe saw Reinke put the gun in the waistband of his pants.
 {¶ 14} Rowe testified that Ogletree then switched places with him so that he could drive, and they waited in the car for approximately 10 minutes until Reinke returned. After Reinke got in the car, he told Ogletree and Rowe, "I think I killed somebody." Reinke gave the gun back to Ogletree, who examined it and saw that four shells were missing. According to Rowe, Ogletree "was like `damn.'"
 {¶ 15} In his first assignment of error, Ogletree contends that the evidence was insufficient to support his conviction for murder because he did not have the requisite intent to kill since he did not participate in the robbery or shooting at Dimitri's. In his second assignment of error, Ogletree argues that his conviction for murder was against the manifest weight of the evidence because there was evidence that he did not intend to kill anyone.
 {¶ 16} The State's brief fails to adequately respond to either of these arguments. Although it sets forth the standards for analyzing arguments regarding the sufficiency and manifest weight of the evidence, it cites to nothing in the record which would demonstrate that Ogletree had the requisite intent and that his conviction was supported by sufficient evidence. With respect to the weight of the evidence, the State argues only that "the jury was in the best position to determine the credibility and reliability of the testimony" and "the jury in reviewing the evidence * * * had sufficient evidence to find the appellant guilty of the offenses charged." Again, it cites no evidence in the record nor does it direct us to even a single case to support its argument. Despite the State's inadequate response, our review and research demonstrates that Ogletree's assignments of error are without merit.
 {¶ 17} A challenge to the sufficiency of the evidence supporting a conviction requires a court to determine whether the State has met its burden of production at trial. State v.Thompkins (1997), 78 Ohio St.3d 380, 390. On review for sufficiency, courts are to assess not whether the State's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. Id. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 18} Ogletree was convicted of murder, which is proscribed in R.C. 2903.02(A): "No person shall purposely cause the death of another * * *." "Purpose" requires an intention to cause a certain result or to engage in conduct that will cause that result. R.C. 2901.22(A).
 {¶ 19} It was undisputed at trial that Reinke, not Ogletree, shot and killed Peter Koutsoulias. The State's theory was that Ogletree was guilty of murder as an aider and abettor to Reinke's actions pursuant to R.C. 2923.03, which provides that "no person, acting with the kind of culpability required for the commission of an offense, shall * * * aid or abet another in committing the offense." It is well settled that "a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts, and intent can be determined from the surrounding facts and circumstances." State v. Carter (1995),72 Ohio St.3d 545, 554. "`A firearm is an inherently dangerous instrumentality, the use of which is likely to produce death.'" State v. Seiber
(1990), 56 Ohio St.3d 4, 14, quoting State v. Widner (1982),69 Ohio St.2d 267, 270. "[W]here an inherently dangerous instrumentality [is] employed, a homicide occurring during the commission of a felony is a natural and probable consequence presumed to have been intended. Such evidence is sufficient to allow a jury to find a purposeful intent to kill." State v.Johnson (1978), 56 Ohio St.2d 35.
 {¶ 20} In State v. Clark (1978), 55 Ohio St.2d 257, the Supreme Court of Ohio considered an argument similar to that which Ogletree makes here. In Clark, the appellant and his companion drove to a gas station and confronted the attendant. Appellant's companion produced a gun and the attendant gave the men his money. When appellant went into the back room to retrieve money from a money box, his companion shot the attendant. Both appellant and his companion then drove away.
 {¶ 21} Appellant argued on appeal, as Ogletree does here, that the State had failed to produce evidence of his specific intent to kill and, therefore, the evidence was insufficient to sustain his conviction for murder. The Supreme Court of Ohio disagreed, stating:
 {¶ 22} "Our examination of the record in the instant cause establishes that appellant participated in the planning and commission of the robbery, and also acquiesced in the employment of a deadly weapon to accomplish this crime. Under these circumstances appellant must have realized that the victim's life would be endangered by the manner and means of performing the act conspired, and accordingly, appellant is bound by the consequences naturally resulting from the furtherance of the conspiracy to commit the aggravated robbery. We therefore hold that the jury had before it sufficient evidence from which to find that appellant possessed a purposeful intent to kill." Id. at 260.
 {¶ 23} Here, Reinke testified that he and Ogletree discussed robbing Dimitri's. In addition, the testimony of both Rowe and Reinke established that Ogletree gave Reinke the gun to use in the commission of the robbery at Dimitri's. Both Reinke and Rowe testified further that Ogletree participated in the robbery by riding in the car to the restaurant, waiting for Reinke to return after the robbery, and then driving the get-away car. This evidence, if believed, is sufficient to establish that Ogletree entered into a plan with Reinke to commit a robbery, agreed to the use of a deadly weapon to commit the robbery, and participated in the robbery.
 {¶ 24} In light of Clark, we find this evidence, if believed, sufficient to demonstrate that Ogletree must have known that the victim's life would be endangered by the armed robbery and, therefore, he is bound by the natural consequences of aiding and abetting Reinke in the robbery. Accordingly, we hold there was sufficient evidence to support the jury's finding that Ogletree had a specific intention to kill Peter Koutsoulias.
 {¶ 25} Appellant's first assignment of error is overruled.
 {¶ 26} In his second assignment of error, Ogletree contends that his murder conviction was against the manifest weight of the evidence
 {¶ 27} because there was evidence that he did not intend to kill Mr. Koutsoulias. Specifically, Ogletree argues that evidence that he told Reinke not to kill anyone before he left the car to rob Dimitri's, said "damn" in disbelief when Reinke told him that he had killed someone, and attempted to distance himself from Reinke after the murder by not letting him into his aunt's house indicates that he did not have the requisite intent to kill.
 {¶ 28} While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest weight challenge questions whether the State has met its burden of persuasion. State v.Thompkins (1997), 78 Ohio St.3d 380, 390. When considering an appellant's claim that the conviction is against the weight of the evidence, a reviewing court sits essentially as a "thirteenth juror" and may disagree with the fact finder's resolution of the conflicting testimony. Id. The reviewing court must examine the entire record, weighing the evidence and considering the credibility of witnesses, while being mindful that credibility generally is an issue of fact for the trier of fact to resolve.State v. Thomas (1982), 70 Ohio St.2d 79, 80. The court may reverse the judgment of conviction if it appears that the jury, in resolving conflicts in the evidence, "`clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"Thompkins, 78 Ohio St.3d at 387, quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.Martin, supra.
 {¶ 29} This is not that exceptional case. The evidence that Ogletree participated in the planning and execution of the robbery at Dimitri's was substantial. Moreover, the evidence was unequivocal that he supplied the gun for the robbery. Accordingly, the jury could reasonably have concluded that Ogletree assisted in creating circumstances that would likely endanger human life and, therefore, that he intended the murder of Mr. Koutsoulias, a natural and foreseeable consequence of the armed robbery.
 {¶ 30} After reviewing the entire record, weighing the evidence, and considering the credibility of the witnesses, we are not persuaded that the jury lost its way and created such a miscarriage of justice that Ogletree's conviction must be reversed.
 {¶ 31} Appellant's second assignment of error is overruled. Affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Kenneth A. Rocco, J., concurs.
 Ann Dyke, P.J., concurs in judgment only.
[1] A "lick" is a robbery.