[Cite as *State v. Fishel*, 2016-Ohio-7656.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| STATE OF OHIO | JUDGES: |
| | Hon. W. Scott Gwin, P. J. |
| Plaintiff-Appellee | Hon. William B. Hoffman, J. |
| | Hon. John W. Wise, J. |
| -vs- | |
| | Case No. 2016 CA 00037 |
| CHRISTOPHER J. FISHEL | |
| | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:          Criminal Appeal from the Court of Common
                                                            Pleas, Case No.  2015 CR 01357


JUDGMENT:                                       Affirmed


DATE OF JUDGMENT ENTRY:         November 7, 2016


APPEARANCES:

For Plaintiff-Appellee                       For Defendant-Appellant

JOHN D. FERRERO                          BERNARD L. HUNT
PROSECUTING ATTORNEY             2395 McGinty Road Road NW
RENEE M. WATSON                         North Canton, Ohio  44720
ASSISTANT PROSECUTOR
110 Central Plaza, South, Suite 510
Canton, Ohio  44702

*Wise, J.*

{¶1} Appellant Christopher J. Fishel appeals his conviction on one count of sexual battery and one count of disseminating matter harmful to juveniles, entered in the Stark County Common Pleas Court following a jury trial.

{¶2} Appellee is the State of Ohio.

## STATEMENT OF THE FACTS

{¶3} In June 2014, then 16-year-old M.G. began contacting the man she believed was her biological father, Defendant-Appellant Christopher Fishel. The contact started with letters and phone calls. When M.G.'s mother discovered M.G.'s efforts, she became angry and intercepted letters from Appellant Fishel. After discovering this, M.G. had Appellant send letters to the address of her grandmother Cindy Lemmeyer. (T. (II) at 136, 161-162.)

{¶4} Meanwhile, M.G.'s relationship with her mother and step-father deteriorated and M.G. moved in with her great-grandparents. Her great-grandparents live on the same property as Lemmeyer, and M.G. would visit with Lemmeyer at least once a day. (T.(II) at 137-138, 159-160).

{¶5} Lemmeyer also corresponded with Appellant via letters and eventually agreed to take M.G. to meet him in person. The first meeting was on Thanksgiving, 2014. Appellant lived with his mother Judy Fishel in Stark County. This fact made Lemmeyer more comfortable when making a decision to permit M.G. to see Appellant outside her supervision. Before she consented to unsupervised visits, Lemmeyer wanted to be sure Appellant was in fact M.G.'s biological father and requested he agree to a paternity test.

The test was completed, and Appellant was determined to be M.G.'s father. (T. (II) at 140-144, 163-164).

{¶6} M.G. began visiting Appellant at his mother's home in December, 2014. Either Lemmeyer would take her there or Appellant and his friends would come and pick her up. At some point that same month, Appellant sent M.G. a video of himself masturbating. Included in the video was the message; "Do you want to play with daddy?" (T. (II) at 153, 165-166, 177-178).

{¶7} Around the same time, M.G. was visiting Appellant and drinking Mike's Hard Lemonade. She started to feel sick, so she laid down on a sofa in the basement and went to sleep. She woke to Appellant beside her, masturbating. M.G. got up, went upstairs to the bathroom and sat there for about 15 minutes. Appellant's mother was home, but M.G. did not say anything to her. (T. (II) at 180-181).

{¶8} M.G. went back to visit Appellant about 4 days later. Appellant was upset about the previous incident and was talking about killing himself. The visit went fine until bedtime. M.G. was drinking again. She and Appellant blew up an air mattress so she could sleep in the basement. M.G. laid down and went to sleep. She woke to find herself naked from the waist down, and Appellant naked on top of her engaging in vaginal intercourse. She recalled that the situation felt like a dream so she figured she was dreaming and went back to sleep. She again told no one. (T. (II) at 182-184).

{¶9} The same thing happened again, approximately 4-5 days later. Again it happened after she fell asleep on the air mattress, but this time she had consumed no alcohol. (T. (II) at 184).

{¶10} In total, there were three such incidences. When M.G. told Appellant she was going to tell, he threatened to kill himself and told her it would be her fault and she would have to live with knowing she had killed her father. M.G. continued to keep Appellant's behavior secret until mid-January, 2015. (T. (II) at 185-186,208).

{¶11} On January 13, 2015, Appellant and his friend Dean showed up at the Wadsworth Taco Bell where M.G. worked. M.G. had expected Dean, but not her father. M.G. and 40-year-old Dean had begun flirting, texting, and talking to one another a couple weeks before. While at Taco Bell, M.G. and Appellant got in an argument when Appellant said something derogatory about M.G.'s mother. M.G. struck Appellant, dumped a drink on him, and told him that she and Dean were going to run away and get married. Appellant called M.G. a "slut", told her they were through, and left. (T. (II) at 168-172).

{¶12} That same day, Appellant sent a text to Lemmeyer telling her that his friend Dean was interested in M.G., and he did not want them getting together. Over the following couple of days, M.G. and Dean spoke frequently, mostly about forgiving Appellant for the Taco Bell incident, and M.G. going back for a visit. (T. (II) at 173).

{¶13} On January 15, Lemmeyer took M.G. to Appellant's home for a visit. When they got there, they found Appellant agitated, pacing, and ranting. There was a crutch by the door and when Lemmeyer asked what it was for, Appellant said it was to beat up Dean if he came over because Dean wanted to sell M.G. for cocaine. Not wanting to listen to her father, M.G. went outside and sat in Lemmeyer's car. (T. (II) at 172-174).

{¶14} Appellant followed M.G. and tried to talk to her. M.G. got out of the car and started walking away. When Appellant began following her, M.G. threw her drink at him. Lemmeyer pulled up beside her, M.G. got in the car, and they drove away. They did not

get far before Appellant called, begging them to come back. Lemmeyer suggested they go back for a few minutes to "see how it goes." (T. (II) at 174-175).

{¶15} When they returned, a North Canton police officer was at the house. Appellant was telling the officer that M.G. was having a sexual relationship with Dean and was going to run away with him. M.G. asked the officer what would happen if a 38-year-old-man had sex with a 17 year old. She claims the officer told her probably nothing because it would be too hard to prove. Lemmeyer spoke with the officer for a bit, and then they left for home. (T. (II) at l75-176).

{¶16} On the way home, Lemmeyer was irritated because she had driven all the way to North Canton and M.G. did not stay. M.G. started crying. Lemmeyer asked M.G. why she asked the officer the question she asked. M.G. responded by showing Lemmeyer the video Appellant had sent of him masturbating. (T. (II) at 147, 176-178).

{¶17} Lemmeyer became concerned about what else may have occurred. She contacted Appellant and told him she had seen the video. A few days later, Lemmeyer had a second conversation with M.G. and M.G. told her everything. Based on that conversation, she contacted Appellant again. Appellant said he would tell her everything, but she would not like what he had to say. He then confirmed M.G.'s story. Lemmeyer sent a letter to the North Canton Police Department reporting what she had learned. (T. (II) 147-149, 179).

{¶18} North Canton police officer John Hemric opened an investigation in response to Lemmeyer's letter. He interviewed Appellant and M.G., seized Appellant's phone and obtained a warrant to search the phone. (T. (II) at 220-224).

{¶19} Appellant denied having sex with his daughter and claimed that he sent the video to M.G. by mistake. According to Appellant, he intended to send the video to a friend named Marissa whose phone contact appeared below M.G.'s in his phone.

{¶20} At trial, Appellant took the stand in his own defense and repeated this tale, also claiming that Marissa called him "daddy." But text messages were also recovered from Appellant's phone. Although texts to Marissa were recovered, Appellant did not start texting Marissa until 3 days after M.G. made her disclosures, and well after he sent the video to M.G. (T. (II) at 225-227, 257, 258, 316).

{¶21} Texts between M.G. and Appellant were recovered from the phone, but there were obvious gaps in conversations indicating texts had been deleted. Additionally, nude pictures of M.G. were found on Appellant's phone. He claimed M.G. asked him to take the photos. M.G. admitted she sent some "selfies" to Appellant. (T. (II) at 268-277).

{¶22} After the allegations came out, Appellant sent M.G. a photo of himself holding a sign which read "I luv u baby plz come back to and forgive me I'm sorry." This photo was also recovered from Appellant's phone. Around the same time, Appellant posted photos of M.G. on his Facebook page. (T. (II) at 191-195).

{¶23} Texts from Appellant to Dean were also recovered from the phone. In a conversation on January 16, the day after M.G. disclosed to Lemmeyer, Appellant tells Dean that he "tried ending it last night" by taking a bunch of pills. He told Dean that "her grandma knows everything" and asked "How do you get over what her and I did, not possible." (T. (II) at 280-283).

{¶24} As a result of these events, in September 2015, the Stark County Grand Jury indicted Appellant on one count of sexual battery, in violation of R.C. §2907.03(A)(5),

and one count of disseminating matter harmful to juveniles, in violation of R.C. §2907.31 (A)(l) and or (A)(2).

{¶25} Appellant pled not guilty to the charges.

{¶26} On January 13, 2016, a jury trial commenced in this matter. The state presented 4 witnesses. Appellant presented testimony from his mother and took the stand in his own defense.

{¶27} The trial court recessed for the evening after closing arguments of counsel. The following morning, the jury deliberated for 5 minutes before convicting Appellant as charged. (T. (III) at 387-388).

{¶28} On January 19, 2016, the trial court sentenced Appellant to five (5) years for sexual battery and twelve (12) months for disseminating matter harmful to juveniles and ordered him to serve the sentences consecutively. He was additionally classified at a Tier III sex offender. (T. (IV) at 15-16).

{¶29} Appellant now appeals, raising the following errors for review:

<u>ASSIGNMENTS OF ERROR</u>

{¶30} "I. THE TRIAL COURT ERRED WHEN IT DENIED THE DEFENDANT'S MOTION TO DISMISS UNDER CRIMINAL RULE 29 (A).

{¶31} "II. THE JURY VERDICTS IN THIS CASE WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL."

**I., II.**

{¶32} Appellant's two Assignments of Error raise common and interrelated issues; therefore, we will address the arguments together.

**{¶33}** Appellant maintains the trial court erred in overruling his Criminal Rule 29 motion for acquittal and his convictions are against both sufficiency and the manifest weight of the evidence.

**{¶34}** An appellate court reviews a denial of a Crim.R. 29 motion for acquittal using the same standard used to review a sufficiency of the evidence claim. *State v. Larry,* 5th Dist. Holmes No. 15CA011, 2016–Ohio–829, ¶ 20 citing *State v. Carter,* 72 Ohio St.3d 545, 553, 651 N.E.2d 965, 1995–Ohio–104.

**{¶35}** The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "[a]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *See State v. Dowdle,* 5th Dist. Stark No. 2015CA00119, 2016–Ohio–485, ¶ 16.

**{¶36}** In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678

N.E.2d 541 (1997). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

**{¶37}** In the case *sub judice*, Appellant was convicted of sexual battery pursuant to R.C. §2907.03(A)(5) and disseminating matter harmful to juveniles pursuant to R.C. §2907.31(A)(1) and/or (A)(2).

**{¶38}** To find Appellant guilty of sexual battery, the trier of fact would have to find beyond a reasonable doubt that, between January 1, 2014, and January 21, 2015, Appellant engaged in sexual conduct with M.G., not his spouse, when Appellant is M.G.'s natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of M.G. (R.C. §2907.03(A)(5).)

**{¶39}** Sexual conduct includes, "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration however slight is sufficient to complete vaginal or anal intercourse." R.C. §2907.01.

**{¶40}** To find Appellant guilty of disseminating matter harmful to juveniles, the trier of fact would have to find that Appellant, as a continuing course of conduct from January 1, 2014, to January 21, 2015, with knowledge of the content, did recklessly present or deliver to M.G., any material or performance that is obscene or harmful to juveniles.

**{¶41}** R.C. §2907.01(E) defines "harmful to juveniles" as:

(E) "Harmful to juveniles" means that quality of any material or performance describing or representing nudity, sexual conduct, sexual excitement, or sado-masochistic abuse in any form to which all of the following apply:

(1) The material or performance, when considered as a whole, appeals to the prurient interest of juveniles in sex;

(2) The material or performance is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for juveniles; and

(3) The material or performance, when considered as a whole, lacks serious literary, artistic, political, and scientific value for juveniles.

{¶42} R.C. §2907.01(F) defines obscene:

(F) When considered as a whole, and judged with reference to ordinary adults or, if it is designed for sexual deviates or other specially susceptible group, judged with reference to that group, any material or performance is "obscene" if any of the following apply:

(1) Its dominant appeal is to prurient interest;

(2) Its dominant tendency is to arouse lust by displaying or depicting sexual activity, masturbation, sexual excitement, or nudity in a way that tends to represent human beings as mere objects of sexual appetite;

(3) Its dominant tendency is to arouse lust by displaying or depicting bestiality or extreme or bizarre violence, cruelty, or brutality;

(4) Its dominant tendency is to appeal to scatological interest by displaying or depicting human bodily functions of elimination in a way that inspires disgust or revulsion in persons with ordinary sensibilities, without serving any genuine scientific, educational, sociological, moral, or artistic purpose;

(5) It contains a series of displays or descriptions of sexual activity, masturbation, sexual excitement, nudity, bestiality, extreme or bizarre violence, cruelty, or brutality, or human bodily functions of elimination, the cumulative effect of which is a dominant tendency to appeal to prurient or scatological interest, when the appeal to such an interest is primarily for its own sake or for commercial exploitation, rather than primarily for a genuine scientific, educational, sociological, moral, or artistic purpose.

**{¶43}** As to the sexual battery charge, M.G. testified that Appellant was her father and that on three separate occasions, he engaged in vaginal intercourse with her. (T. (III) at 182-185). By itself, M.G.'s testimony is sufficient to prove each element of the charge of sexual battery. One witness, believed by a jury, is sufficient to establish a fact. *State v. Jamison* (1990), 49 Ohio St.3d 182, certiorari denied (1990), 498 U.S. 881.

**{¶44}** While Appellant argues that M.G.'s testimony should not be believed because she did not tell Judy Fishel about the incidents sooner and initially denied that same had occurred, such goes to credibility which is a matter for the jury as the trier of fact to determine. 'While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.' " *State v. Naugle*, 5th District

Stark No. 2008-CA-00190, 2009-Ohio-3268. *See also State v. Craig* (Mar. 23, 2000), Franklin App. No. 99AP–739, 2000 WL 297252, *3, quoting *State v. Nivens* (May 28, 1996), Franklin App. No. 95APA09–1236, 1996 WL 284714, *3.

**{¶45}** With regard to the charge of disseminating matter harmful to juveniles, Appellant is not disputing that the content of the video of him masturbating is "obscene" or that he sent such video to M.G., but argues instead that he sent it to her in error because he had intended to send the video to a friend named Marissa whose name is in his contact list immediately after his daughter in his phone.

**{¶46}** The jury was free to accept or reject any and all of the evidence offered by the parties and assess the witnesses' credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. McGregor,* 5th Dist. Ashland No. 15–COA–023, 2016–Ohio–3082, ¶ 10, citing *State v. Craig,* 10th Dist. Franklin No. 99AP–739 (Mar. 23, 2000). Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. *Id.* Our review of the entire record reveals no significant inconsistencies or other conflicts in appellee's evidence that would demonstrate a lack of credibility of appellee's witnesses.

**{¶47}** Appellant has not shown that "a miscarriage of justice" occurred or that the jury "lost its way" when it found him guilty of sexual battery and disseminating matter harmful to juveniles.

{¶48} Appellant's Assignments of Error are overruled.

{¶49} For the reasons stated in the foregoing opinion, the judgment of the Stark County Court of Common Pleas is affirmed.

By: Wise, J.

Gwin, P. J., and

Hoffman, J., concur.

JWW/d 1026